503 S.E.2d 173

**Roy Todd JONES, Appellant,**

v.

**GENERAL ELECTRIC COMPANY and
Richard Carpenter, Defendants,**

**of whom General Electric Company is Respondent.**

**No. 2839.**

Court of Appeals of South Carolina.

Submitted April 7, 1998.
Decided May 4, 1998.
Rehearing Denied Aug. 20, 1998.

M. Lee Daniels, Jr., of Wimberly, Lawson, Daniels & Brandon, Greenville, for Appellant.

William H. Foster and Steven M. Wynkoop, both of Nelson, Mullins, Riley & Scarborough, Greenville, for Respondent.

ANDERSON, Judge:

This is a wrongful termination case involving an employee handbook. Roy Todd Jones appeals the trial court's decision to direct a verdict in favor of his former employer, General Electric Company (G.E.). Specifically, Jones appeals the trial court's rulings that (1) G.E.'s employee handbook did not create a contract altering Jones's at-will employment status; and (2) even if the handbook created an employment contract, Jones failed to prove that G.E. breached it. We reverse and remand.[1]

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

## FACTUAL/PROCEDURAL BACKGROUND

Jones began working for G.E. in 1991, when he accepted a position as a fabricator. His duties consisted of welding metal panels to machinery to protect it from foreign objects during shipping.

Shortly after G.E. hired him, Jones attended an orientation meeting for new employees. During this meeting, the employees were given G.E. employee handbooks. When all of the new employees had received a copy of this handbook, the orientation speaker informed them that G.E. abided by the rules in the handbook and that, essentially, the handbook was G.E.'s "bible." No one at this meeting, however, told the new employees that the handbook was not to be considered a contract or that G.E. was not bound by the rules appearing therein.

Published in 1988, the handbook contained G.E.'s rules and policies, as well as other general employment information. The Foreword included language stating employment at G.E. was at will. For ease of use, G.E. divided the handbook into separate, tabbed sections. One of these tabbed sections specifically addressed G.E.'s work rules. At the end of the Work Rules section, G.E. delineated specific rules regarding proper conduct which G.E. expected its employees to follow. G.E. prefaced these rules with the following statement:

> Rules defining conduct are necessary at GE as in all organizations which rely for their success on people working together effectively, harmoniously and safely. Infractions of these rules may lead to disciplinary actions up to and including discharge.

> The lists which follow are typical of behavior which can result in disciplinary action including discharge, but are not all-inclusive. Disciplinary action may be appropriate in situations in addition to those listed here.

Immediately following this statement were two lists of rules. The handbook described the first list, entitled "Class I" violations, as "typical examples of behavior which is prohibited and in which a single offense subjects the involved employee(s) to discharge." The second list contained "Class II" violations, which were described as "offenses which, with repetition, will lead to disciplinary time off and/or discharge." One example

of a Class I violation is "[f]alsifying or forging" any company or business-related document or record. However, as noted above, the handbook provided the examples of violations listed were not all-inclusive.

In 1993, Jones attended a meeting during which G.E. personnel distributed a revised version of the G.E. employee handbook. This revised version contained substantially the same information as the 1988 handbook in the section on Work Rules. Similar language appears in the Foreword, but this time a sentence stating that the handbook is not a guarantee of employment or a contract appears in all capitals in the body of the Foreword.

The events leading to Jones's termination began the night of March 30, 1994 when Allen Duncan, a G.E. supervisor on the second shift, instructed Jones and Richard Carpenter, who were both working the third shift, to install an insulator panel on turbine No. 5510. The third shift began at 7:00 p.m. Before Jones and Carpenter installed the panel, a Quality Control (QC) inspector verified that the turbine inlet was free from all foreign objects and stamped the turbine's paperwork to reflect that the unit had passed inspection.

Following this inspection, Jones and Carpenter installed the insulator panel. Once they finished the job, Jones placed the turbine's paperwork in the proper cubicle, and he and Carpenter attended to other jobs in the plant. Jones left early that night and did not return to work until after the Easter holiday.

In the meantime, at the end of his shift, Carpenter approached Eugene Blake, a co-worker who was temporarily working on the first shift, telling him that a washer had fallen into the turbine and asking Blake to retrieve it. While Carpenter was explaining the incident to Blake, Duncan overheard the conversation and confronted Carpenter. Carpenter then admitted that a washer had been dropped in the turbine unit. Carpenter maintained that when he suggested that they remove the washer, Jones told him to leave the washer in the unit.[2] After speaking with Carpenter, Duncan instructed

---

2. Carpenter admitted to Duncan that Jones had pointed out that he (Carpenter) had dropped a washer in the turbine. However, when

Blake to enter the unit and remove the washer. Blake found the washer and removed it.

Duncan reported this incident to Joe Rae, the second- and third-shift manager. Rae later met with Carpenter, who confirmed Duncan's account of the incident. Carpenter admitted to Rae that he (Carpenter) had actually dropped the washer in the turbine, but asserted Jones told him to leave it in the unit. When Jones returned from vacation, Rae confronted him about the incident. Jones denied having any knowledge that a washer had been left in the turbine unit. Jones stated that to his knowledge, nothing unusual had occurred during the installation of the panel before he left for the holiday.

Having heard both Carpenter's and Jones's versions of the incident, Rae met with his supervisor, a human resources representative, and Duncan to discuss the facts surrounding the incident and to consider the available disciplinary options. After discussing the incident, they decided to terminate Jones's employment for falsifying a company document. Although Jones had not written anything on the paperwork for the turbine, they viewed Jones's failure to take any corrective action once he was allegedly aware that a washer had fallen into the turbine as tantamount to falsification of the QC report, a Class I violation. In a letter Rae wrote to Jones on April 6, 1994 terminating Jones's employment with G.E., Rae stated G.E. was terminating Jones's employment for falsifying a company document. Under the terms of G.E.'s employee handbook, this offense was a Class I violation, subjecting Jones to immediate discharge.

Jones appealed his termination through the employee grievance process, but to no avail. Jones then brought this lawsuit against G.E., alleging G.E.'s employment handbook created an employment contract which G.E. had breached and that G.E. had defamed him. At trial, G.E. moved for a directed verdict on all of Jones's causes of action. The trial court granted G.E.'s motion, finding Jones had failed, as a matter of law, to establish the G.E. employee handbook created a contract of employment. Alternatively, the trial court ruled that even if

---

Carpenter suggested they retrieve the washer, Jones purportedly told Carpenter to just "leave it in there; they'll find it in the field."

the handbook had constituted an employment contract, Jones failed to prove G.E. had breached its terms. Jones appeals.

## ISSUES

(1) Did the trial court err in concluding that, as a matter of law, G.E.'s employee handbook did not create an employment contract?

(2) Did the trial court err in finding that, as a matter of law, Jones failed to prove G.E. breached the employment contract when it terminated his employment?

## STANDARD OF REVIEW

It is well established that when considering a motion for a directed verdict, the trial court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. If the evidence as a whole is susceptible of more than one reasonable inference, the case should be submitted to the jury. *Gamble v. Int'l Paper Realty Corp.*, 323 S.C. 367, 474 S.E.2d 438 (1996); *Rice v. Multimedia, Inc.*, 318 S.C. 95, 456 S.E.2d 381 (1995). *See also Creech v. South Carolina Wildlife & Marine Resources Dep't*, 328 S.C. 24, 491 S.E.2d 571 (1997) (in ruling on a motion for a directed verdict, the trial court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motion).

In ruling on a directed verdict motion, the trial court is concerned only with the existence or non-existence of evidence, and the court does not have the authority to decide credibility issues or to resolve conflicts in the testimony. *Garrett v. Locke*, 309 S.C. 94, 419 S.E.2d 842 (Ct.App.1992) (judge erred in granting directed verdict where more than one inference arose from the evidence; conflicts in the testimony were for the jury to resolve as the finders of fact).

In reviewing the grant of a directed verdict, the appellate court should not ignore facts unfavorable to the opposing party. Rather, it must determine whether a verdict for the opposing party would be reasonably possible under the facts as liberally construed in his favor. *Bultman v. Barber*, 277 S.C. 5, 281 S.E.2d 791 (1981). *See also Hanahan v. Simpson,*

326 S.C. 140, 485 S.E.2d 903 (1997) (in reviewing a directed verdict, the appellate court must determine whether a verdict for the party opposing the motion would have been reasonably possible under the facts; the question becomes one of law for the trial court where only one reasonable inference can be deduced from the evidence); *First State Sav. & Loan v. Phelps*, 299 S.C. 441, 385 S.E.2d 821 (1989) (in reviewing the granting of a motion for directed verdict, we should determine the elements of the action alleged and whether any evidence existed on each element).

## LAW/ANALYSIS

Jones presents two arguments on appeal. First, he contends the trial court erred in concluding that, as a matter of law, G.E.'s employee handbook did not create an employment contract. Second, Jones argues the trial court erred in finding that, as a matter of law, Jones failed to prove G.E. breached the employment contract when it terminated his employment.

### I. Employee Handbook as Contract of Employment

■ The common law rule is that if employment is not for a definite term, and if there is no contractual or statutory restriction on the right of discharge, the employment is presumed to be terminable at the will of either party, and the employer may lawfully discharge an employee for any cause or no cause without incurring liability for wrongful discharge. Theresa Ludwig Kruk, Annotation, *Right to Discharge Allegedly "At–Will" Employee as Affected by Employer's Promulgation of Employment Policies as to Discharge*, 33 A.L.R.4th 120, 123 (1984). South Carolina has recognized exceptions to the common law rule (1) where the discharge violates a clear mandate of public policy, *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985) (at-will employee may not be terminated for refusing to violate the law by ignoring subpoena), or (2) where the employee's at-will status has been altered by the promulgation of an employee handbook, *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987) (*Small* I) (employee handbook could alter an employee's at-will status so as to subject employer to liability for wrongful discharge). *See also Small v. Springs Indus., Inc.*, 300 S.C. 481, 388 S.E.2d 808 (1990) (*Small* II) (in certain situations,

termination of an at-will employee may give rise to a cause of action for wrongful termination where the at-will status of the employee is altered by the terms of an employee handbook or where the discharge violates a clear mandate of public policy).

An individual working for an employer under a contract of employment for an indefinite period can be terminated at will. *Shealy v. Fowler*, 182 S.C. 81, 188 S.E. 499 (1936). At-will employment is generally terminable by either party at any time, for any reason or for no reason at all. *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 276 S.C. 284, 278 S.E.2d 607 (1981), appeal after remand, 283 S.C. 155, 321 S.E.2d 602 (Ct.App.1984), writ granted in part, 285 S.C. 84, 328 S.E.2d 479 (1985), quashed, 287 S.C. 190, 336 S.E.2d 472 (1985). The termination of an at-will employee normally does not give rise to [a] cause of action for breach of contract. *Hudson v. Zenith Engraving Co., Inc.*, 273 S.C. 766, 259 S.E.2d 812 (1979). However, in certain limited situations, an employer's discharge of an at-will employee may give rise to a cause of action for wrongful discharge[,] such as where the at-will status of the employee is altered by the terms of an employee handbook, *Small v. Springs Industries, Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987), or where the discharge violates a clear mandate of public policy. *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985).

*Small* II, 300 S.C. at 484, 388 S.E.2d at 810.

A trial court should submit to the jury the issue of the existence of a contract of employment when (a) its existence is questioned and (b) the evidence is either conflicting or admits of more than one inference. *Small* I, 292 S.C. at 483, 357 S.E.2d at 454.

A formal meeting of the minds between the parties is irrelevant on the issue of whether an employee handbook can form the basis of a contract between the employer and the employee. *Miller v. Schmid Labs., Inc.*, 307 S.C. 140, 414 S.E.2d 126 (1992). Rather, in establishing such a claim, the relevant issues are whether (1) the handbook set out procedures binding on the employer, (2) those procedures applied to the discharged employee, and (3) the employer violated those procedures. *Id.* at 142, 414 S.E.2d at 127.

■ If the employer wishes to issue an employee handbook without being bound by it and with a desire to continue under the at-will rule, the employer is free to do so by inserting a conspicuous disclaimer in the employee handbook stating the handbook creates no right of employment and the company can terminate employment at any time. *Johnson v. First Carolina Fin. Corp.*, 305 S.C. 556, 409 S.E.2d 804 (Ct.App. 1991) (citing *Small* I).

A. Effect of Disclaimer

■ We find there is a material question of fact as to whether the disclaimer in the Foreword of G.E.'s employee handbook, which stated employment was at will and the handbook was not a contract of employment, was conspicuous.

The 1988 handbook contained the following language in a section entitled "Foreword":

The information in this employee handbook is provided as a general guide to policies, practices and programs at GE's Greenville Gas Turbine Manufacturing Plant. These may be modified or adjusted from time to time in the interests of effective management of the business.

Employment status at this plant is at will. This means that an employee can quit his or her job at any time, with or without giving notice, and with or without a particular reason or cause. Likewise, employment of an employee may be terminated by the company on the same basis. No manager or supervisor at the Greenville Plant is authorized to make employment agreements for a specified period of time, nor is any language in this handbook intended to imply a guarantee of employment for a specified period. Employment agreements must be in writing and signed by an officer of the Company.

The Job Facts *Employee Handbook* was published in this format in March, 1981 following its development by a committee of sixteen hourly and nonexempt employees representing all shifts. This revision reflects the new Peer Grievance Panel and other updates.

Depending on your job, you may report to either a supervisor or manager. To simplify this handbook, you will

see the word "supervisor" used throughout which covers both classifications of management.

The 1993 handbook contained the following information in its "Foreword":

The information in this hourly and non-exempt salaried employee handbook is provided as a general guide to policies, practices and programs at GE's Greenville Gas Turbine Manufacturing Plant. These may be modified or adjusted from time to time in the interests of effective management of the business.

Employment status at this plant is at-will. This means that an employee can quit his or her job at any time, without giving notice, and with or without a particular reason or cause. Likewise, employment of an employee may be terminated by the company on the same basis. No manager or supervisor at the Greenville plant is authorized to make employment agreements for any specified period of time. THE LANGUAGE IN THIS HANDBOOK IS NOT INTENDED TO IMPLY AND IS NOT A GUARANTEE OF EMPLOYMENT FOR A SPECIFIED PERIOD OF TIME. THIS HANDBOOK IS NOT AN EMPLOYMENT AGREEMENT. Employment Agreements must be in writing and signed by an officer of the company.

The *Job Facts Employee Handbook* was initially published in March, 1981 following its development by a committee of sixteen hourly and nonexempt employees representing all shifts. This revision reflects the growth and evolution of our business, including the GE Power Generation Vision and Commitments, ISO 9000, references to Work–Out, Workforce Diversity, Continuous improvement, the Peer Grievance Panel and other practice updates. The format has also been changed from a small, bound handbook to a three-ring binder. This new format will permit quicker updates and revisions and allow replacement of individual pages as our business and plant adapt to today's rapid pace of change.

Depending on your job, you may report to either a supervisor or manager, and the terms are used interchangeably throughout the Handbook. Team Leaders may also assist the various teams with work assignments and shop priority issues.

In *Small* I, wherein our Supreme Court first held that an employee handbook may form the basis for an employment contract between the employer and the employee, the court stated that an employer could disclaim any contractual obligation by including a conspicuous disclaimer in its handbook:

> Unquestionably, Springs was under no obligation to write and distribute the employee handbook or the bulletin. Once Springs voluntarily chose to publish the handbook and bulletin and orally assure the employees that the provisions of those publications would be followed, there were "strong equitable and social policy reasons militating against allowing employers to promulgate for their employees potentially misleading personnel manuals while reserving the right to deviate from them at their own caprice." *Walker v. Westinghouse Electric Corporation*, 77 N.C.App. 253, 259, 335 S.E.2d 79, 83 (1985). "Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 619, 292 N.W.2d 880, 895 (1980).
>
> If an employer wishes to issue policies, manuals, or bulletins as purely advisory statements with no intent of being bound by them and with a desire to continue under the employment at will policy, he certainly is free to do so. This could be accomplished merely by inserting a conspicuous disclaimer or provision into the written document. It is patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies as "a gratuitous, nonbinding statement of general policy" whenever it works to his disadvantage. Assuredly, the employer would view these policies differently if it were the employee who failed to follow them.

*Small* I, 292 S.C. at 485, 357 S.E.2d at 454–55.

We analyzed the elements to be considered in determining whether a disclaimer provision was conspicuous *in Kumpf v. United Telephone Co. of the Carolinas*, 311 S.C. 533, 429 S.E.2d 869 (Ct.App.1993), *cert. denied* (S.C.1994):

In *Small* [I], the Supreme Court did not define conspicuous. Therefore, we must look to other areas of the law for a meaningful definition. South Carolina's version of the Uniform Commercial Code (UCC) defines conspicuous as follows:

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. . . .

S.C.Code Ann. § 36–1–201(10) (1976). Although *this court recognizes that the UCC is not applicable to this case, it provides guidance* in determining whether the disclaimer in the manual issued by United is conspicuous.

Furthermore, in *South Carolina Electric & Gas Co. v. Combustion Engineering, Inc.*, 283 S.C. 182, 186, 322 S.E.2d 453, 456 (S.C.App.1984), this court found that a disclaimer, indistinct as to color and type and located on the seventeenth page of a twenty-two page document was not conspicuous. Compare, *Marr v. City of Columbia*, [307 S.C. 545], 416 S.E.2d 615 (1992) (conspicuousness found where disclaimer placed in large letters on the front cover of employee handbook, and then reiterated in large bold type on a separate page of the handbook); *Johnson v. First Carolina Financial Corp.*, 305 S.C. 556, 558, 409 S.E.2d 804, 805 (Ct.App.1991) (disclaimer found to be conspicuous where there were statements in two places in body of a handbook declaring the at-will status of employees, plus a capitalized statement at the end of the handbook requiring employees to confirm they understood the handbook did not create an express or implied contract). Like in *South Carolina Electric & Gas Co. v. Combustion Engineering, Inc.*, the disclaimer here was located on the last page of the document under the heading "CONCLUSION". It was neither capitalized, bolded, set apart with distinctive border, or in contrasting type or color. Thus, it was inconspicuous and ineffective.

*Id.* at 537–38, 429 S.E.2d at 872 (emphasis added).

In *Hannah v. United Refrigerated Services, Inc.*, 312 S.C. 42, 430 S.E.2d 539 (Ct.App.1993), *cert. denied*, (S.C.1993), this

Court reviewed *Kumpf* and other recent cases evaluating the conspicuousness of various disclaimer provisions:

> In *Johnson v. First Carolina Financial Corp.*, 305 S.C. 556, 557–58, 409 S.E.2d 804, 805 (Ct.App.1991), this Court affirmed summary judgment as to the conspicuousness of a disclaimer where the handbook included a statement at the beginning of the handbook confirming that it did not alter the employee's at-will status, plus an additional disclaimer after the disciplinary procedures section, and finally a capitalized statement at the end requiring the employee to confirm he understood the handbook did not create an express or implied contract.
>
> Subsequently, in *Marr v. City of Columbia*, [307 S.C. 545, 547], 416 S.E.2d 615, 616 (1992), our Supreme Court affirmed summary judgment as to the conspicuousness of a disclaimer which was placed in large letters on the front cover of the handbook, and then reiterated in large bold type on a separate page of the handbook.
>
> In this court's recent opinion in *Kumpf v. United Telephone [Co.] of the Carolinas, Inc.*, [311 S.C. 533], 429 S.E.2d 869 (S.C.Ct.App.1993), because *Small* [I] does not define conspicuousness, we turned to the Uniform Commercial Code for guidance. S.C.Code Ann. § 36–1–201(10) provides that "the language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color." We held that a disclaimer located in the "conclusion" section of a handbook that was not capitalized, in bold type, set apart with distinctive border, or in contrasting type or color, was not conspicuous.

*Id.* at 45, 430 S.E.2d at 541 (footnote omitted).

In *Hannah*, United's employee handbook began with a "Welcome" section. The second page of this section contained a paragraph stating the handbook was not intended to be a contract. *Id.* at 44, 430 S.E.2d at 541. We stated, *"The test for conspicuousness [of a disclaimer] is whether there is something about the provision that reasonably calls attention to it."* *Id.* at 46, 430 S.E.2d at 541–42 (emphasis added). We found "nothing in the relative location of the provision in question that would reasonably call its contents to the attention of a reasonable person." *Id.* at 46, 430 S.E.2d at 542.

Accordingly, we concluded the provision was not conspicuous as a matter of law. *Id.*

Finally, in *Fleming v. Borden,* 316 S.C. 452, 450 S.E.2d 589 (1994), the South Carolina Supreme Court stated a disclaimer is merely one factor to consider in determining whether the handbook as a whole conveys enforceable promises, and the question is generally one of fact for the jury to determine.

> [T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced. . . . The disclaimer, which necessarily militates against enforcement, should be weighed in the balance along with other handbook provisions . . . . [A] handbook that contains both promissory language and a disclaimer should be viewed as inherently ambiguous. Thus, . . . the entire handbook, including any disclaimer, should be considered in determining whether the handbook gives rise to a promise, an expectation and a benefit.

> As with any question of fact, this is primarily a matter for the jury to decide. The court should intervene to resolve the handbook issue as a matter of law only if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist.

*Id.* at 463–64, 450 S.E.2d at 596 (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers,* 13 Indus.Rel.L.J. 326, 375–76 (1991–92)). The court concluded, "In most instances, summary judgment is inappropriate when the handbook contains both a disclaimer and promises." *Id.*

The *Fleming* court noted that the Court of Appeals had looked to the UCC definition of "conspicuous" by way of *analogy* in *Hannah,* and had recognized in *Kumpf* that the UCC is inapplicable in employment cases. Further, in the *Johnson* case, this Court had "implicitly recognized that the question of whether a disclaimer is conspicuous is a fact question." *Id.* at 464 n. 6, 450 S.E.2d at 596 n. 6.

In the case now before us, the language in the 1988 G.E. handbook stating employment was at will was not distinguished from the other information by bold type, underlining, or any other method to emphasize and reasonably call atten-

tion to its contents. In the 1993 version of the handbook, the language is in all capitals, but it is not otherwise distinguished by being underlined, set apart with a distinctive border, or in a contrasting type or color, etc. The information appears only in the body of the Foreword, and is not repeated. Accordingly, we find there is a material question of fact as to whether the language was sufficiently conspicuous to be effective as a disclaimer.

Further, there is a material question of fact as to whether Jones had actual notice of the changes appearing in the Foreword and other sections of the 1993 handbook. In *Fleming*, our Supreme Court held "that the implied contract of employment created by an employee handbook may be modified by a subsequent employee handbook." *Id.* at 463, 450 S.E.2d at 595. To be effective, an employee must have actual notice of the modification. *Id.* at 463, 450 S.E.2d at 595–96. Jones testified that he attended G.E.'s orientation meeting for new employees when he began work in 1991. At that meeting, human resources personnel distributed G.E.'s employee handbook (the 1988 version). The G.E. representatives instructed the employees that the handbook was G.E.'s "bible," and that they abided by the Work Rules described therein. Jones testified the representatives went over the rules, but no one at G.E. pointed out the disclaimer information in the Foreword which stated the handbook was not a guarantee of employment for a specified period and that employment remained at will. Jones stated he did not read the information in the Foreword until after he was discharged.

Jones testified that when the new handbook came out in 1993, G.E. called a meeting announcing the new version. Jones stated G.E. representatives went over some changes in the Work Rules that had been reworded to avoid loopholes, and that the employees were told that both handbooks were still being used, and to keep both of them. Jones stated no one at the meeting told the employees to read the information contained in the Foreword of the new handbook, and that he did not read the Foreword in the 1993 handbook until after his termination. He stated the employees were given copies of the new handbook at the end of the meeting on their way out the door. Therefore, viewing the evidence in the light most

favorable to Jones, the non-moving party, we find a material question of fact exists on this issue.

## B.  Permissive versus Mandatory Nature of Handbook Rules

■ We next find there is a material question of fact as to whether the terms of the G.E. employee handbook were to be considered mandatory or merely permissive.

The Work Rules section of the 1993 handbook provides:

Rules defining conduct are necessary at GE as in all organizations which rely for their success on people working together effectively, harmoniously and safely. *Infractions of these rules may lead to disciplinary action up to and including discharge.*

*The lists which follow are typical of behavior which can result in disciplinary action including discharge, but are not all-inclusive. Disciplinary action may be appropriate in situations in addition to those listed here:*

### Class I

*The following are typical examples of behavior which is prohibited and in which a single offense subjects the involved employee(s) to discharge:*

1.  Theft.
2.  Falsifying or forging any Company or business related document or record.
3.  Being off Company property without permission while registered in for work.
4.  Insubordination, including refusal to perform assigned work.
5.  Violation of any environmental, health, or safety rules, safety procedures, or other acts which endanger the employee, the environment, or others.
6.  Failure to comply with plant security requirements or procedures.
7.  Willful damage or attempt to damage property.
8.  Falsification of hours of work (yours or another employee's).

9. Possession or use of firearms, ammunition, explosives (including firecrackers or other fireworks) or any other weapons on Company property.

10. Sleeping during working hours.

11. Gambling on Company property.

12. Possessing, drinking, or [being] under the influence of alcoholic beverages on Company property.

13. Illegally possessing, taking, or being under the influence of drugs on Company property or possession of equipment to administer drugs.

14. Committing or contributing to criminal, immoral, abusive, or indecent acts on Company property or actions which are grossly inconsistent with acceptable behavior that may disrupt normal business operations, such as false fire alarms, etc.

15. Acts or threats of violence, fighting, assault, intimidation, harassment, or coercion on Company property, or off Company property where the incident arises out of or is related to the work place.

16. Deliberate acts evidencing intent to avoid scheduled work or intentional slowdown, or which intentionally inhibit the quality or productivity of others.

17. Violation of solicitation or distribution rules.

18. Sexual harassment.

19. Violations of Company Policy 20.10.

20. Willful violation of any state or federal environmental or workplace safety laws.

**NOTE: DISCIPLINARY ACTION TAKEN FOR VIOLATION OF THESE RULES DOES NOT PRECLUDE LEGAL PROCESS.**

Class II

*The following are offenses which, with repetition, will lead to disciplinary time off and/or discharge:*

1. Excessive absenteeism and/or tardiness.

2. Unsatisfactory effort or too much time away from job.

3. Poor quality work or careless acts resulting in defects or rework.

4. Horseplay or other conduct which is dangerous or improper in a workplace.

5. Minor infractions of environmental, health, or safety rules.

6. Failure to follow specific methods, specifications, etc.

7. Leaving work area or failing to report to work area while registered in for work without authorization.

8. Operating equipment without authority.

9. Failure to observe plant parking and traffic rules.

10. Failure to register "in" or "out" for work (punch-in, badge-in, etc.).

11. Refusal to work reasonable overtime.

12. Performing non-company work with company equipment or materials, or on company time.

13. Failure to meet housekeeping requirements.

14. Taking food or beverages into factory areas. Reading non-company materials in the factory.

(Emphasis added.) The Work Rules listed in the 1988 handbook were substantially the same and in the same format as the 1993 version.

The trial judge ruled that G.E.'s employee handbook was "couched in permissive, nonexclusive, as opposed to mandatory, terms." In *Small* I, our Supreme Court held that it is "patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies as a 'gratuitous, nonbinding statement of general policy' whenever it works to his disadvantage." *Small* I, 292 S.C. at 485, 357 S.E.2d at 455.

As noted above, Jones testified that the G.E. representatives instructed the new employees during orientation that the handbook was G.E.'s "bible," and that they abided by the procedures described therein. This Court recently stated in *Prescott v. Farmers Telephone Co-op., Inc.*, 328 S.C. 379, 385, 491 S.E.2d 698, 701 (Ct.App.1997):

While an employer may insert a conspicuous disclaimer into a handbook which states that the policies contained within will not alter at-will status, an employer may not publish a policy with mandatory language, orally assure the employ-

ees that the policy will be followed, and then treat the promise as illusory.

The introductory language to the Work Rules section states, "Infractions of these rules *may* lead to disciplinary action up to and including discharge." (Emphasis added.) Class I violations are described as behavior "in which a single offense subjects the involved employee(s) to discharge." Class II offenses provide for progressive discipline for repeated violations and are described as "offenses which, *with repetition, will lead to* disciplinary time off and/or discharge." (Emphasis added.)

In addition, the handbook contains a Grievance Procedure for "resolv[ing] any major differences" which is outlined as follows: (1) the employee first discusses any "job-related problems" with the supervisor; (2) the employee has the right to seek review by an Employee Relations Representative or obtain an appointment with the next level of management for a decision; if the employee is unhappy with the decision, the employee can be assigned or can select an "ombudser" to assist in filing a written grievance; (3) the ombudser and the employee then present the grievance both orally and in writing to the next higher level manager; (4) finally, if the employee still is not satisfied with the decision, the employee can seek review by either a three-member management panel or a five-member peer panel.

In the introduction to the Grievance Procedure, both the 1988 and the 1993 versions of the G.E. handbook state: "The 'Grievance Procedure' is a confidential tool to resolve significant problems and misunderstandings. The Greenville Plant Staff encourages you to use this procedure to resolve any major differences—*it is your right.*" (Emphasis added.) Following description of the multi-step procedure detailed above, the 1988 version of the handbook provides: "REMEMBER ... No one can help you with your problem unless he or she knows one exists. *This procedure guarantees you the right* to discuss significant problems and misunderstandings through all levels of management in the Greenville Plant." (Emphasis added.) In the 1993 version, the word "REMEMBER" is in bold type and underlined, and the last phrase has been

changed to read "... misunderstandings through all levels of Greenville operations."

We conclude there is a material question of fact as to whether G.E.'s employee handbook, particularly the section entitled Work Rules, established mandatory procedures or whether the handbook contains merely permissive provisions outlining employee conduct.

## II. Breach of Alleged Employment Contract

Jones contends there is a material question of fact as to whether G.E. reasonably determined Jones had committed an offense which justified immediate discharge. Jones denied any knowledge that a washer had been left in the turbine unit as reported by his co-worker, Carpenter, after Jones had left on vacation. Jones argues it was for a jury to decide whether G.E. could have reasonably concluded that the alleged offense amounted to falsification of a company document, a Class I offense subjecting him to immediate discharge, in view of the fact that Jones did not write anything on the QC report and did not otherwise alter the company document. Further, Jones testified there were certain inconsistencies in the physical evidence that made Carpenter's story implausible.

In *Small* I, our Supreme Court stated:

It was for the jury to decide whether the handbook, the bulletin, and the oral assurances constituted an employment contract. If the jury found that they did, then it had to decide whether or not Springs reasonably could have determined that Small's actions constituted a serious offense which could result in discharge without the four-step process. The jury obviously determined that a contract was established and that Small's actions could not have fallen into the "serious offense" category. Since Springs admittedly failed to follow its own discharge policy, the jury allowed Small to recover for breach of contract.

*Small* I, 292 S.C. at 483–84, 357 S.E.2d at 454.

In *Prescott*, 328 S.C. 379, 491 S.E.2d 698, this Court held that "If the fact finder finds a contract to terminate only for cause, he must determine whether the employer had a reasonable good faith belief that sufficient cause existed for termination. Employers cannot be expected to act as judges, so the

test is not whether the employee actually committed misconduct, but whether the employer had a reasonable good faith belief that it had cause to terminate." *Id.* at 393, 491 S.E.2d at 705.

Viewing the evidence in the light most favorable to Jones, as we are required to do, we believe there is a material question of fact as to whether G.E. breached the terms of any employment contract which may have existed between G.E. and Jones. Since the evidence was conflicting, it was up to the jury to determine whether the alleged offense—failing to report that a washer had been dropped in the turbine—constituted falsification of a company document, a Class I violation subjecting Jones to immediate discharge. Accordingly, it was up to the fact finder to determine if G.E. had followed its handbook procedures in terminating Jones.

## CONCLUSION

Finding there are material issues of fact as to whether the G.E. employee handbook and any other representations constituted a contract of employment, and whether G.E. breached the terms of any contract that may have existed, we reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

HUFF and HOWARD, JJ., concur.