343 S.C. 424 (2000)
540 S.E.2d 113
R & G CONSTRUCTION, INC., Respondent,
v.
LOWCOUNTRY REGIONAL TRANSPORTATION AUTHORITY, Appellant.
No. 3264.
Court of Appeals of South Carolina.
Heard November 9, 2000.
Decided December 4, 2000.
Rehearing Denied January 29, 2001.
*428 H. Fred Kuhn, Jr., of Moss & Kuhn, of Beaufort, for appellant.
William B. Harvey, III, of Harvey & Battey, of Beaufort, for respondent.
*429 ANDERSON, Judge:
In this breach of contract action, Lowcountry Regional Transportation Authority (LRTA) appeals the trial court's refusal to grant a directed verdict and the court's admission of a closure report and letter. We affirm.

FACTS/PROCEDURAL BACKGROUND
LRTA runs a public transportation bus service for Beaufort, Jasper, Colleton, Hampton, and Allendale counties. From approximately 1983, LRTA operated a maintenance and fueling facility in the Burton area of Beaufort County. Two fuel pumps and two underground fuel storage tanks were located at the Burton site. The facilities were located on land owned by Beaufort County, which provided LRTA with the Burton site free of charge as part of its contribution to LRTA. LRTA installed the fuel tanks and used them for about twelve years.
Sometime in 1994 or 1995, LRTA decided to move its maintenance and fuel site from Burton to Bluffton. In anticipation of LRTA's move to Bluffton, Beaufort County located a buyer for the Burton site. However, before the County could sell the land, it had to ensure the site was environmentally clean. Over the years LRTA used the site, the underground fuel tanks corroded and leaked fuel into the surrounding soil. The County requested LRTA remove the two underground fuel tanks.
LRTA asked Beaufort County to solicit bids for the tank removal and cleanup of the Burton facility. In February of 1995, Beaufort County issued an invitation for bids for the "removal/disposal" of the two 4,000 gallon underground fuel tanks.
On March 16, 1995, R & G Construction submitted a bid setting out the following prices:
(1) $4,000 for the "Removal/Disposal of two (2) 4000 gallon fuel tanks";
(2) $17.60 per ton for field monitoring and soil analysis;
(3) $64.00 per ton for soil disposal; and
(4) $6.00 per yard for fill dirt.
Over three months later, Samuel Smith, LRTA's Executive Director, sent R & G a purchase order for the "Removal of *430 fuel tanks in accordance with bid dated 3-16-95 ... $4,000.00." The purchase order was issued on a form bearing the name, address, and telephone number of LRTA.
R & G removed the fuel tanks and disposed of and replaced contaminated soil. The total cost for the job was $47,982.98. LRTA refused to pay more than $4,000. LRTA contended it neither contracted for R & G to test, remove, or replace the soil at the facility nor agreed for it to do so.
R & G filed a complaint against LRTA alleging breach of contract. Alternatively, R & G claimed it performed valuable work for LRTA and should be paid under the theory of quantum meruit. R & G sought damages in the amount of the remaining contract balance, $43,982.98. LRTA answered, denying the existence of a contract and alternatively averring it withheld payment due to R & G's alleged failure to complete the project.
At the close of R & G's case, LRTA moved for a directed verdict on the grounds (1) Samuel Smith did not have the authority to bind LRTA to the alleged contract and (2) LRTA did not have a contract with R & G for the removal and replacement of the soil, but only for the removal and disposal of the tanks, which totaled $4,000. The court denied the motion. The jury awarded R & G $43,982.98 in actual damages.

STANDARD OF REVIEW

Breach of Contract Action
An action for breach of contract seeking money damages is an action at law. Sterling Dev. Co. v. Collins, 309 S.C. 237, 421 S.E.2d 402 (1992); Kuznik v. Bees Ferry Assocs., 342 S.C. 579, 538 S.E.2d 15 (Ct.App.2000). See also South Carolina Fed. Sav. Bank v. Thornton-Crosby Dev. Co., 310 S.C. 232, 423 S.E.2d 114 (1992) (action seeking money damages for breach of contract is action at law). Our review of an action at law tried by a jury extends merely to correcting errors of law. We will not disturb the facts determined by the jury unless there is no evidence which reasonably supports the jury's findings. Townes Assocs., Ltd. v. City of Greenville, *431 266 S.C. 81, 221 S.E.2d 773 (1976); Brown v. Smalls, 325 S.C. 547, 481 S.E.2d 444 (Ct.App.1997).

Directed Verdict
In ruling on a motion for directed verdict, the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. Futch v. McAllister Towing, 335 S.C. 598, 518 S.E.2d 591 (1999); Collins v. Bisson Moving & Storage, Inc., 332 S.C. 290, 504 S.E.2d 347 (Ct.App.1998). See also Weir v. Citicorp Nat'l Servs., Inc., 312 S.C. 511, 435 S.E.2d 864 (1993) (illustrating an appellate court must apply the same standard when reviewing the trial judge's decision on such motions). When the evidence yields only one inference, a directed verdict in favor of the moving party is proper. Swinton Creek Nursery v. Edisto Farm Credit, 334 S.C. 469, 514 S.E.2d 126 (1999); Arthurs v. Aiken County, 338 S.C. 253, 525 S.E.2d 542 (Ct.App.1999). If more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury. Mullinax v. J.M. Brown Amusement Co., 333 S.C. 89, 508 S.E.2d 848 (1998); Arthurs, supra. In ruling on a directed verdict motion, the trial court is concerned only with the existence or non-existence of evidence. Long v. Norris & Assocs., Ltd., 342 S.C. 561, 538 S.E.2d 5 (Ct.App.2000); Jones v. General Elec. Co., 331 S.C. 351, 503 S.E.2d 173 (Ct.App.1998). This Court may only reverse the denial of a motion for directed verdict if no evidence supports the trial court's ruling. Swinton Creek Nursery, supra; Arthurs, supra.

ISSUES
I. Did the trial court err In denying LRTA's motion for directed verdict?
II. Did the trial court err in admitting the closure report and closure letter?

LAW/ANALYSIS

I. Directed Verdict

A. Apparent Authority
LRTA argues the trial judge erred in refusing to direct a verdict for LRTA where Samuel Smith had neither actual nor apparent authority to bind LRTA. We disagree.
*432 In reviewing the trial court's denial of LRTA's motion for directed verdict, this Court must determine whether, viewing the evidence in the light most favorable to R & G, there is any evidence in the record to support the trial court's finding Smith had authority to enter into the contract on LRTA's behalf. See Creech v. South Carolina Wildlife and Marine Resources Dep't, 328 S.C. 24, 491 S.E.2d 571 (1997).
A true agency relationship may be established by evidence of actual or apparent authority. See Fochtman v. Clanton's Auto Auction Sales, 233 S.C. 581, 106 S.E.2d 272 (1958). See also Fernander v. Thigpen, 278 S.C. 140, 293 S.E.2d 424 (1982) (agency relationship may be proven by evidence of apparent or implied authority, even where parties have entered agreement to contrary). The doctrine of apparent authority focuses on the principal's manifestation to a third party that the agent has certain authority. Rickborn v. Liberty Life Ins. Co., 321 S.C. 291, 468 S.E.2d 292 (1996). Concomitantly, the principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption. Fernander, supra; Eadie v. H.A. Sack Co., 322 S.C. 164, 470 S.E.2d 397 (Ct.App.1996). Thus, the concept of apparent authority depends upon manifestations by the principal to a third party and the reasonable belief by the third party that the agent is authorized to bind the principal. Beasley v. Kerr-McGee Chem. Corp., 273 S.C. 523, 257 S.E.2d 726 (1979); Visual Graphics Leasing Corp. v. Lucia, 311 S.C. 484, 429 S.E.2d 839 (Ct.App.1993). See also Moore v. North American Van Lines, 310 S.C. 236, 423 S.E.2d 116 (1992) (basis of apparent authority is representations made by principal to third party and reliance by third party on those representations).
Apparent authority must be established based upon manifestations by the principal, not the agent. See Shropshire v. Prahalis, 309 S.C. 70, 419 S.E.2d 829 (Ct.App. 1992). The proper focus in determining a claim of apparent authority is not on the relationship between the principal and the agent, but on that between the principal and the third *433 party. Vereen v. Liberty Life Ins. Co., 306 S.C. 423, 412 S.E.2d 425 (Ct.App.1991). An agency may not be established solely by the declarations and conduct of an alleged agent. Frasier v. Palmetto Homes, 323 S.C. 240, 473 S.E.2d 865 (Ct.App.1996).
Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him. Id. Either the principal must intend to cause the third person to believe the agent is authorized to act for him, or he should realize his conduct is likely to create such belief. Id. See also Watkins v. Mobil Oil Corp., 291 S.C. 62, 352 S.E.2d 284 (Ct.App.1986) (to establish apparent agency, party must prove purported principal has represented another to be his agent by either affirmative conduct or conscious and voluntary inaction).
The elements of apparent agency are: (1) purported principal consciously or impliedly represented another to be his agent; (2) third party reasonably relied on the representation; and (3) third party detrimentally changed his or her position in reliance on the representation. See Graves v. Serbin Farms, Inc., 306 S.C. 60, 409 S.E.2d 769 (1991); ZIV Television Programs, Inc. v. Associated Grocers, Inc., 236 S.C. 448, 114 S.E.2d 826 (1960). In the principal and agent relationship, apparent authority is considered to be a power which a principal holds his agent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence. Beasley v. Kerr-McGee Chem. Corp., 273 S.C. 523, 257 S.E.2d 726 (1979); Anthony v. Padmar, Inc., 307 S.C. 503, 415 S.E.2d 828 (Ct.App.1992).
When a principal, by any such acts or conduct, has knowingly caused or permitted another to appear to be his agent, either generally or for a particular purpose, he will be estopped to deny such agency to the injury of third persons who have in good faith and in the exercise of reasonable prudence dealt with the agent on the faith of such appearances. Mortgage & Acceptance Corp. v. Stewart, 142 S.C. 375, 140 S.E. 804 (1927). The apparent authority of an agent *434 results from conduct or other manifestations of the principal's consent, whereby third persons are justified in believing the agent is acting within his authority. Genovese v. Bergeron, 327 S.C. 567, 490 S.E.2d 608 (Ct.App.1997). Such authority is implied where the principal passively permits the agent to appear to a third person to have the authority to act on his behalf. Id.
Generally, agency is a question of fact. Gathers v. Harris Teeter Supermarket, 282 S.C. 220, 317 S.E.2d 748 (Ct.App.1984). Agency may be implied or inferred and may be proved circumstantially by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal. Fernander v. Thigpen, 278 S.C. 140, 293 S.E.2d 424 (1982). If there are any facts tending to prove an agency relationship, it then becomes a question for the jury. Gathers, supra.
The record reveals LRTA made the following representations of Smith's authority. The bid invitation referred prospective bidders to "contact Mr. Sam Smith at LRTA" for a site inspection. Smith testified he was the Executive Director of the LRTA during the entire period of dealing with R & G concerning the project. Thomas Heywood, who succeeded Ronald Voegeli as LRTA Chairman, corroborated the fact that Smith was Executive Director. According to Smith, he was the only person "within the LRTA organization that would have any knowledge of this matter."
After receiving the R & G bid, Smith presented it to the Board. The Board voted, authorized the project, and instructed Smith to proceed with the removal of the tanks. Smith directed Mary Palmer, an "administrative assistant" with LRTA, to issue a purchase order. The purchase order for the project was typed on LRTA letterhead. Smith's signature was featured prominently in the middle area of the purchase order. Palmer confirmed Smith was the Executive Director.
Smith's office was located at the LRTA Burton site. Smith monitored the progress of the project. He contacted DHEC to request the agency check on the removal of the soil when he became concerned too much soil was being removed by Dr. Lowell Sieck, a consultant for Native Soils, the subcontractor.
*435 Viewing the evidence in the light most favorable to R & G, the evidence gives rise to a reasonable inference LRTA represented to others that Smith had the authority to enter into the contract. The bid invitation referred R & G and other prospective bidders to Sam Smith. LRTA conceded Smith was its Executive Director. Smith presented the bid to the Board and issued the purchase order for the job on LRTA letterhead. After requesting and receiving the closure letter, Smith issued partial payment of $4,000 to R & G. Smith monitored R & G's performance throughout the process. These words and acts, reasonably interpreted, could lead a third person to believe LRTA consented to have Smith act on its behalf to enter into a contract for the cleanup of the Burton site.
R & G reasonably relied on the representation by LRTA as to Smith's authority. Further, in reliance on this representation, R & G completed the work to its detriment because LRTA refused to compensate R & G for the full amount of the work.
R & G presented overwhelming evidence "tending to prove" Smith's apparent authority. See Gathers v. Harris Teeter Supermarket, 282 S.C. 220, 317 S.E.2d 748 (Ct.App.1984). Thus, the trial court properly submitted this issue to the jury.

B. Contract Provided for Removal of Contaminated Soil
LRTA alleges the contract only covered the removal of the tanks. LRTA further claims there is no evidence in the record it had a contract with R & G for the disposal and replacement of the soil. This contention is contradicted by the evidence that Smith monitored the soil removal and even contacted DHEC out of concern that R & G was removing more soil than required by the contract.
Smith testified he checked to make sure R & G was performing in accordance with the bid:
And in accordance to [sic] the bid they were required to havegot [sic] all of the permits, any fees that needed that were associated, anything that was associated with the removal of those tanks they were required to get those approvals. (Emphasis added). *436 The record is replete with evidence that the disposal and replacement of contaminated soil in accordance with DHEC requirements was part of the turnkey nature of the job.
The document entitled "Specifications for Removal/Disposal of Two (2) 4000 Gallon Underground Fuel Tanks," which was included with the bid invitation, read in part:
3. Contractor must furnish everything necessary for "turn[k]ey" job to include, but not necessar[il]y be limited to, insurance, business license, permits, compliance with all local, state and federal regulations/laws, and lab reports.
4. Contractors are to furnish lump sum bids for all known items and unit prices for any unknown items. (Emphasis added.)
In compliance with the bid invitation, R & G supplied LRTA with a fixed price for the known work and with unit prices for the unknown work, the testing, disposal, and replacement of contaminated soil. Samuel Smith and Ronald Voegeli specifically testified that LRTA was responsible for DHEC's requirements regarding the removal of contaminated soil. Voegeli declared:
Q. So you would agree with testimony of Mr. Smith that whatever DHEC required in cleaning up whatever pollution or contaminants came from those tanks is your responsibility?
A. We knew that would be our responsibility, yes, sir.
Immediately prior to LRTA's acceptance of R & G's bid, Smith called Tom Whetsell, Vice-President of R & G. Smith was concerned because the bid was about to expire. Whetsell informed Smith that R & G would still perform the job for the same price. Smith stated "that was great because they were really pressured to get it cleaned up so that they could turn it back over to Beaufort County, that they needed to get this [site] cleaned up." Further, the two men "briefly discussed the fact that if there was any contamination that [contamination] needed to be removed because they had to give a clean site back to the county."
Dr. Sieck met with Smith prior to starting the job. Dr. Sieck "explained to Mr. Smith that there was probably going to be considerable soil that had to be remediated." According *437 to Dr. Sieck, Smith's response "was the same as it had been in his office that the property was being sold and needed to be cleaned up and we should do what we had to do to make sure that no contamination was left on site that would compromise the sale of that property." Further, Dr. Sieck testified: "[Smith] said in the pre-construction meeting on this ... that the site needed to be cleaned for this sale and that money was available to do it."
At a later meeting, Dr. Sieck explained to Smith that the soil was being transported to the Hickory Hill landfill. Smith signed the manifest for the delivery of contaminated soil to the Hickory Hill dump site. Smith never told Dr. Sieck not to proceed with the transport. Moreover, at this meeting with Dr. Sieck, Smith did not indicate LRTA was not paying for the removal or transport of the soil.
We find there is evidence that LRTA contracted with R & G to remove the soil and to complete everything required in order to turn the site over to its new owner. Smith agreed the contract required LRTA to pay for removal of only the amount of soil that was absolutely necessary. There is no evidence in the record that R & G removed more soil than was necessary.
We conclude the trial court properly denied LRTA's motion for directed verdict on this ground.

C. Performance of Work by Subcontractor
LRTA, citing no authority, makes a conclusory argument in its brief that R & G did not perform the work and is therefore not entitled to payment under the contract. An issue is deemed abandoned if the argument in the brief is only conclusory. See Solomon v. City Realty Co., 262 S.C. 198, 203 S.E.2d 435 (1974).
Nonetheless, R & G had the right to subcontract the work. The arrangement between R & G and Native Soils is fully explained by the testimony. Tom Whetsell is vicepresident of R & G Construction in Charlotte, North Carolina. R & G is a licensed contractor. Whetsell contracted with Native Soils and its consultant, Dr. Lowell Sieck, for Native Soils to be the subcontractor on the LRTA project. The fact that R & G chose to perform the work through a subcontractor *438 does not lessen its right to recover its fee for the work performed.
The jury concluded R & G performed the contract. This Court will not disturb a jury's findings of fact unless there is no evidence that reasonably tends to support those findings. See Brown v. Smalls, 325 S.C. 547, 481 S.E.2d 444 (Ct.App.1997). The subcontractor relationship is permissible as long as R & G remained liable for the performance. There was no evidence in the record that R & G was not liable to LRTA for the completion of the work. The court did not err in submitting the case to the jury.

II. Admission of Closure Report and Closure Letter
LRTA contends the trial court erred in admitting the closure report and closure letter. LRTA maintains the report and letter contain inadmissible hearsay.
Dr. Sieck, who was qualified at trial as an expert in the field of biochemistry, environmental toxicology, and removal of underground fuel tanks and remediation of contaminated soil, testified he prepared the closure report. Dr. Sieck supervised the project and was the project manager. Dr. Sieck personally performed the field operation tests. As he conducted these tests, Dr. Sieck made notes in a field log regarding his results. These notes later became part of the closure report. Dr. Sieck opined the soil was contaminated. According to Whetsell, a "closure report shows all of the facts, the amount of soil that was removed, the amount of contamination, testing, the amount of testing, goes into detail, and also the amount of soil removed, and also where it is disposed of, that it's properly disposed of. This is a requirement of DHEC to issue a clean bill of health on any property."
Trident Labs, a DHEC certified testing laboratory, corroborated the readings Dr. Sieck "got in the field." The readings "came back as certified data." A technician with Trident Labs tested the samples collected by Dr. Sieck and found the soil showed a total petroleum hydrocarbon concentration of over 2,500 parts per million. The closure report prepared by Dr. Sieck contained and relied upon the test results from Trident Labs and the weight measurements from Hickory Hill.
*439 The admission of evidence is within the trial court's discretion. Washington v. Whitaker, 317 S.C. 108, 451 S.E.2d 894 (1994); Haselden v. Davis, 341 S.C. 486, 534 S.E.2d 295 (Ct.App.2000). The court's ruling to admit or exclude evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law. See Strother v. Lexington County Recreation Comm'n, 332 S.C. 54 n. 2, 504 S.E.2d 117 n. 2 (1998). See also Carlyle v. Tuomey Hosp., 305 S.C. 187, 407 S.E.2d 630 (1991) (absent showing of clear abuse of discretion, trial court's admission or rejection of evidence is not subject to reversal on appeal).
Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801, SCRE. "`If, then, an utterance can be used as circumstantial evidence, i.e. without inferring from it as an assertion to the fact asserted, the Hearsay rule does not oppose any barrier, because it is not applicable.'" Player v. Thompson, 259 S.C. 600, 609-10, 193 S.E.2d 531, 535 (1972) (testimony of defendant automobile driver, who was called by plaintiff injured passenger, that several weeks prior to accident filling station attendant had stated to driver and wife of owner that automobile had bad tires would be receivable, not as testimonial assertion by attendant to prove fact of slick tires, but as indicating that driver and wife, who gave driver permission to use vehicle, obtained knowledge of slick tires, the fact of slick tires being proved by other evidence; inasmuch as testimony was not offered to prove truth of matter asserted but solely to prove notice, which is a state of mind, the hearsay rule did not apply) (quoting 6 John Henry Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 1788 (3d ed.1940)).
A statement that is not offered to prove the truth of the matter asserted should not be excluded as hearsay. Hawkins v. Pathology Assocs., 330 S.C. 92, 498 S.E.2d 395 (Ct.App. 1998) (allowing admission of letters, an anniversary card, and video to show close familial bond between decedent, her husband, and her children in malpractice action).
In this case, the closure letter and report were not admitted for the truth of the matters asserted within them. *440 They were offered to show that R & G completed all acts precedent to receiving payment. Counsel for R & G informed the court: "Your Honor, we're not offering this for the [truth of the] matter asserted. We're offering this for the purpose of establishing one, that we complied with DHEC protocol and procedures, and two, that we completed the job. And part of completing the job is getting a closure report of a clean site assessment by DHEC." On direct examination, Whetsell was asked: "Did you have any conversation with Mr. Smith about the submittal of a DHEC closing letter?" Whetsell responded: "Mr. Smith asked us to submit a closure report so that he could give us a check, basically is what he told us. He said... [h]e needed a closure report so he could show that the job was complete so that we could be paid."
LRTA claimed R & G did not complete the job. LRTA requested that R & G provide a closure letter as a condition precedent to receiving payment. R & G complied and requested that DHEC send a letter. Mark Berenbrok with DHEC sent a letter to Jeff Logan at LRTA stating: "The report documents results of an environmental assessment performed during June of 1996. Based on the Information submitted to date, the SCDHEC does not require further site assessment or rehabilitation."
The closure letter and report were not admitted to prove the truth of their contents but to demonstrate R & G completed the work. Therefore, the hearsay rule was not applicable and the trial court properly admitted them.

CONCLUSION
We hold the trial court properly denied LRTA's motion for directed verdict based on a trifurcated analysis: (1) R & G presented overwhelming evidence tending to prove Smith's apparent authority; (2) evidence exists that LRTA contracted with R & G to remove the tanks and the soil and to complete everything required in order to turn the site over in a "clean" condition to its new owner; and (3) there was no evidence in the record that R & G was not liable to LRTA for the completion of the work even though it subcontracted the work out to Native Soils. Finally, the trial court did not err in admitting the closure report and closure letter. We conclude *441 the report and letter were not offered to prove the truth of the matter asserted and, thus, should not be excluded as hearsay. Accordingly, the judgment of the Circuit Court is
AFFIRMED.
HEARN, C.J., and STILWELL, J., concur.