Curtis Wayne **TALIAFERRO**, Plaintiff,

v.

**ASSOCIATES CORPORATION OF NORTH AMERICA, a Texas Corporation; Associates First Capital Corporation, a Delaware Corporation; Associates First Capital Corporation, Short–Term Disability Plan; Associates Long–Term Disability Plan; Associates First Capital Corporation Pension Plan; Associates Financial Services Company, Inc.; and AETNA U.S. Healthcare, Inc., a Texas Corporation, Defendants.**

No. C.A. 2:98–2894–23.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 21, 1999.

Rap P. McClain, Charleston, SC, for Plaintiff.

Kelly M. Hundley, J. Lewis Sapp, Patrick L. Lail, Ellerbee, Thompson & Trapnell, Atlanta, GA, Samuel M. Coleman, Charleston, SC, for Defendants.

### ORDER

DUFFY, District Judge.

This matter is before the court upon cross motions for summary judgment addressing all causes of action. Based upon the arguments submitted by both parties, the court grants the defendants' motion for summary judgment and denies the plaintiff's motion for partial summary judgment without a hearing as allowed by D.S.C. Local Rule 7.08 (1999).

## I. INTRODUCTION

From April 1986 through October 1, 1997, Mr. Talaiferro was employed by Associates Financial Services Company, Inc. ("Associates"). Associates is engaged in the business of consumer lending through a network of branch offices located throughout the United States. This action arises from the Mr. Talaiferro's termination on October 1, 1997. In his Complaint filed on October 2, 1998, Mr. Talaiferro alleges:

(1) his termination was because of his age in violation of the Age Discrimination in Employment Act ("ADEA");

(2) his termination was because of an alleged disability in violation of the Americans with Disabilities Act ("ADA");

(3) he was terminated to prevent him from obtaining benefits in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA");

(4) his termination breached an alleged contract of employment and an alleged duty of good faith and fair dealing;

(5) he was unlawfully denied benefits under the Associates' Short–Term and Long–Term Disability Plans;

(6) defendants violated their fiduciary duties to the Plans; and

(7) defendants violated ERISA by refusing to disclose certain documents. Defendants have since filed for summary judgment on all of Mr. Talaiferro's claims, and Mr. Talaiferro has filed for partial summary judgment as to the ERISA-based claims. Mr. Talaiferro does not oppose defendants' motion for summary judgment as to the ADEA violation.[1]

---

1. In considering a motion for summary judgment pursuant to Fed.R.Civ.P. 56, the court must review the motion, even if unopposed, and determine from what it has before it

## II. FACTUAL BACKGROUND

In January, 1996, Mr. Talaiferro was employed as a Group Manager[2] over several branches in South Carolina ("Charleston Group"). In late January 1996, Mr. Talaiferro's immediate supervisor, Tom Brewer, received an anonymous letter from "Concerned Charleston Group Employees" complaining about Mr. Talaiferro's management style and techniques. (Brewer Dep., Ex. 1). The letter complained of various items, including threats of termination, belittling and disparaging conduct and comments in meetings, and being given no advance notice of overtime required.

In early February 1996, on the heels of the earlier anonymous letter, another anonymous letter complaining about Mr. Talaiferro was sent to Associates President Tom Slone. (Brewer Dep., p. 18, Ex. 2). This letter, from "Families of [Charleston] Employees," reiterated some of the same issues raised in the first letter and also complained of more tenured employees being targeted for removal as "deadweight." *Id.*

In response to these letters, Mr. Brewer and his immediate supervisor, Jay Springer, convened a "town hall" meeting with the Charleston Group employees for the purpose of discussing any issues or complaints that employees had regarding the operation and/or supervision of the group. (Brewer Dep., p. 32; Springer Dec., ¶ 2). During the meeting, some of the concerns raised in the anonymous letters were discussed.

Shortly thereafter, during the second week of February, Mr. Brewer completed a performance evaluation on Mr. Talaiferro and reviewed it with him. The appraisal reflected that Mr. Talaiferro needed improvement in the area of "Cooperation and Teamwork/Effectiveness in Working With People," commenting that Mr. Talaiferro should "be less rigid and more flexible." (Pl.Dep., Vol.I, Ex. 11, p. 2). In the area of "Communication Effectiveness" Mr. Brewer recommended that Mr. Talaiferro "be less demanding and more persuasive." *Id.* In the appraisal category of "Agreed Upon Development Needs," the evaluation reflected the need for Mr. Talaiferro to "show more compassion with employees" with the need for a "sensitivity course" listed under the heading of "Areas for Future Development." *Id.* at 3, 4. Thereafter, Mr. Brewer periodically reminded him to be less rigid in dealing with employees. (Brewer Dep., p. 46).[3] In March, 1996, following up the suggestion in the performance evaluation, Mr. Talaiferro was sent to an Experience Compression Laboratory ("ECL") seminar. (Springer Dec., ¶ 2; Brewer Dep., p. 39).[4] Mr. Ta-

whether the moving party is entitled to summary judgment as a matter of law. "This duty of the court is restated in section (e) of the rule, providing, 'if the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.'" *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir.1993) (quoting Fed. R.Civ.P. 56(e)). The court finds that summary judgment is appropriate as to Mr. Talaiferro's claim under the ADEA. The record fails to support any allegation that age was a factor in the termination decision.

2. A group manager supervises the business development, collection, and compliance efforts for eight to ten branches; this is accomplished, in part, by conducting "supervisions," or reviews, of various aspects of the branches' business such as lending, collec-

tions, and personnel. (Pl.Dep., Vol.I, pp. 87–90).

3. Mr. Taliferro admits that he and Mr. Brewer went over the entire evaluation. (Pl.Dep., Vol.I, pp. 118–20). Mr. Talaiferro acknowledged these concerns with his own comment in the evaluation that "[T]here are times that I expect too much too quick from people." *Id.* at 1.

4. During the six day seminar, attendees, in the context of role-playing, participate in various management scenarios with other attendees. (Forbis Dep., pp. 9–10). After each scenario, the participants and staff give feedback, based on direct observation and on videotaping, regarding how the role-player's management style and interpersonal skills were perceived by others. *Id.* at 9–10. The

laiferro describes this seminar as a management development program and denies any awareness that his supervisors viewed the program as a "sensitivity course." (Pl. Dep., Vol.I, pp. 116–17). The Associates understood that the Experience Compression Laboratory involved built-in feedback from other seminar participants and from videotaping, permitting each participant to see himself from a third person perspective. (Ramesh Dep., p. 19). The Associates contend that their intention was for Mr. Talaiferro to receive feedback about his management style and how it impacted upon and was perceived by others in an effort to help him improve his people skills. (Springer Dec., ¶ 2; Brewer Dep., pp. 39–40). Associates had utilized this seminar in the past to help managers improve deficient or inadequate people skills, (Mize Dep., pp. 22–23), and Mr. Talaiferro himself acknowledged that the seminar involved feedback discussion, including video replay, of his interactions with others, (Pl. Dep., Vol.I, pp. 61–62).

In July, 1996, following several days of visits with Mr. Talaiferro to the branches reporting to him, Mr. Brewer sent a memo to Mr. Talaiferro summarizing his observations. (Brewer Dep., Ex. 7). The memo expressed disappointment generally, and specifically in a number of instances regarding the performance of branches under Mr. Talaiferro's supervision, concluding with the following statements:

> . . . Even more concerning is the harsh and somewhat dictatorial manner in which you give direction to your subordinates.
>
> Wayne, you need to "walk softly" and quit telling everyone you have a big stick. Back off on the threats and in-

timidation; tell the folks what you want and then work with them for the desired results.

(Brewer Dep., Ex. 7).

Effective September 1, 1996, Mr. Talaiferro was demoted by Mr. Brewer to the position of Branch Manager[5] of Associate's Orangeburg, South Carolina branch. (Pl.Dep., Vol.I, p. 136). Mr. Talaiferro claims not to have viewed the "demotion" as indicative of his performance, but deemed it a result of a poor performance audit by the Orangeburg branch. There was no change in his salary or other compensation. Mr. Talaiferro thought he was to be restored to another group as VP as soon as he had cleaned up the performance of the Orangeburg branch. (Pl.Dep., Vol.I, p. 137). However, Brewer explains that the demotion resulted from violations of company policies with respect to certain branch operations, though Mr. Talaiferro had represented that such violations had not occurred, all in conjunction with the history of concerns pertaining to Mr. Talaiferro's people skills and management techniques. (See Brewer Dep., Ex. 8).

During a September, 1997 supervision visit to the Orangeburg branch, Mr. Binkley, the Group Manager, took several female employees to lunch. (Binkley Dep., p. 36). During this lunch, the employees complained about Mr. Talaiferro and the manner in which he treated them. (Binkley Dep., p. 36). The employees complained that Mr. Talaiferro threatened terminations during staff meetings, (Sunday Dep., pp. 37–38; Berry Dep., p. 13; Hansen Dec., ¶ 3), exhibited agitation by stomping his foot, swearing and publicly belittling employees, and even referring to

---

goal is to help the participant understand the impact of his or her interpersonal style on others. *Id.* at 11.

**5.** As Branch Manager, Mr. Talaiferro was responsible for the operation and business performance of the Orangeburg branch. (Pl. Dep., Vol.I, pp. 141–42). For example, he was responsible for analyzing, approving and rejecting loans up to certain limits; insuring

that the loans and loan documentation generated in the branch complied with applicable law and Associates' policies and procedures; marketing Associates finance programs to local businesses to obtain financing relationships for consumer purchases; supervising and evaluating the branch staff; and overseeing the collection efforts of the branch. *Id.*

one employee's work as "stupid" and "useless." (Sunday Dep., pp. 14–15; Barry Dep., pp. 16, 17–18). Mr. Talaiferro barked criticisms from his desk in the open office. (Berry Dep., pp. 31–32). Concerned about what had been reported, Mr. Binkley took several of the male employees to lunch the next day and they confirmed many of the complaints and perceptions of the female branch employees. (Binkley Dep., p. 36; Glover Dep., pp. 38–39).

Mr. Binkley contacted a Human Resources advisor and discussed the situation presented to him by the employees. (Binkley Dep., p. 36). Mr. Binkley requested and obtained written statements from four female branch employees regarding their specific complaints about Mr. Talaiferro's conduct. (Binkley Dep., p. 36; Exs. 6–9). The written statements reiterated and summarized the complaints and comments made during the lunches. (Binkley Dec., ¶ 6). Mr. Binkley also reported the situation to his supervisor, Mr. Brewer. (Binkley Dep., pp. 36–37).

After receiving copies of the written statements from Mr. Binkley, Mr. Brewer conferred with his superior, Ken Mize. (Brewer Dep., p. 77). Messrs. Mize and Brewer consulted with a Human Resources official. (Mize Dep., p. 28). Mr. Brewer visited the Orangeburg branch and interviewed each branch employee privately regarding their complaints and concerns. (Brewer Dep., pp. 77–84; Brewer Dec., ¶ 4). The employees reiterated and confirmed the substance of their written statements and their statements corroborated aspects of complaints by others. (Brewer Dep., pp. 84; Brewer Dec., ¶ 4). In light of these complaints and the past history of Mr. Talaiferro's interpersonal difficulties, Mr. Talaiferro's employment was terminated on October 1, 1997. Mr. Brewer informed Mr. Talaiferro that he was being terminated because the staff in Orangeburg had been complaining about the manner in which he treated them. (Pl. Dep., Vol.I, p. 24, 62).

Nine months prior to his termination, Mr. Talaiferro claims to have injured his back when he stepped into a hole during an exercise run. (Pl.Dep., Vol.I, p. 45). In March, due to increasing pain in his back, Mr. Talaiferro consulted his family physician, Dr. Redwine. Upon examination, Dr. Redwine referred Mr. Talaiferro to Dr. Pacult, a neurologist, who soon diagnosed Mr. Talaiferro with severe osteoporosis. *Id.* at 47. Around this time, Mr. Talaiferro began taking pain medication daily. *Id.* at 49. By June, Mr. Talaiferro had been referred to a specialist in osteoporosis, Dr. Gray. The doctors confirmed that Mr. Talaiferro had sustained a compression fracture in one of his thoracic vertebra; that the fracture was not healing due to the osteoporosis; that the osteoporosis was progressing and was not responding to medication and other treatment; and that he was suffering chronic back pain associated with the fracture vertebra that required him to take analgesic medication. Both Dr. Gray and Dr. Jones, a physician at the Charleston Spine and Physical Medicine practice, opined that he was totally disabled employment by June 12, 1997. (*See* Pl. Dep., Vol. Exs.).

Mr. Talaiferro maintains that in spite of his struggles with his back pain, he attempted to continue working, at least until the conclusion of the next audit. (Pl.Dep. V.II, p. 86). Mr. Talaiferro testified that prior to his termination he inquired by telephone to the Dallas, Texas office about applying for disability. (Pl. Dep. Vol II, p. 81). He took no further action until the morning of his termination when, in the middle of being terminated, he asked Brewer if he could just go ahead and put in his papers for disability. (Pl.Dep.Vol.I, p. 66). After his termination, however, Mr. Talaiferro applied for disability benefits through the Associates' benefit plan organization. After the plan denied disability benefits, this suit was filed on October 2, 1998. In June, 1999, the United States Social Security Administration granted Mr. Talaiferro disability benefits.

## III. ANALYSIS

### A. THE ADA

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge." 42 U.S.C.A. § 12112(a) (West 1995). To establish a cause of action under this provision, Mr. Taliaferro must show that (1) he has a disability, (2) he is otherwise qualified for the employment in question, and (3) he was excluded from the employment based on the disability. *See Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 348 (4th Cir.1996) (per curium). The term "qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8) (West 1995).

In the absence of direct evidence of discrimination, the *McDonnell Douglas* scheme of proof applies to issues of whether a discharge was based on an employee's disability. *See Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir.1997) (en banc), overruled on different grounds by *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). To establish a prima facie case in an ADA discharge case, a Mr. Taliaferro must demonstrate (1) that he was disabled, (2) that he was discharged, (3) that at the time of the discharge, he was performing at a level that met her employer's legitimate expectations, and (4) that his discharge occurred under circumstances that raise a reasonable inference of illegal discrimination. *See id.* at 164. "The burden of establishing a *prima facie* case rests with [Taliaferro], and if he fails to establish every element of [his] claim, summary judgment in favor of the [defendant employer] is proper." *Hindman v. Greenville Hosp. Sys.*, 947 F.Supp. 215, 220 (D.S.C.1996) (citation omitted). Mr. Taliaferro's burden of establishing a *prima*

*facie* case is not an onerous one, but merely a threshold burden. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

If Mr. Taliaferro can meet this initial burden of proof, the burden will shift to Associates "to articulate some legitimate, nondiscriminatory explanation which ... would support a finding that unlawful discrimination was not the cause of the employment action." *Ennis v. National Assoc. of Business & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995). Once Associates satisfies this burden of production, the presumption created by the *prima facie* showing " 'drops out of the picture,' " and the Mr. Taliaferro bears the ultimate burden of proving that she has been the victim of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Mr. Taliaferro must produce evidence that Associates' true reason for discharging him was discriminatory, and it is not enough for Taliaferro to state that Associates' reasons are not credible. *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason [for the termination]." *Id.*

■ Taliaferro fails to establish both that he was a "qualified individual" and that he suffered from a "disability" at the time of his discharge, and as such cannot maintain his claim for discrimination under the ADA. First, Mr. Taliaferro relies upon his award of Social Security Disability Income (SSDI) as evidence that he is a "qualified individual with a disability." Mr. Taliaferro argues that because the Social Security Administration found him "disabled" as of October 1, 1997, he must qualify as a protected person under the ADA. This argument is, however, flawed. The Supreme Court in *Cleveland v. Policy Mgt. Sys., Corp.*, 526 U.S. 795, ——, 119

S.Ct. 1597, 1601, 143 L.Ed.2d 966 (1999), recently rejected a coinciding version of this identical argument, explaining that the statutory purposes and considerations governing whether one is disabled under the Social Security analysis differs substantially from as ADA analysis. The Social Security Act provides monetary benefits to those persons who have a "disability" defined as a severe impairment which prevents the applicant from doing her previous work or from engaging in any other kind of gainful work which exists in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 1998). In contrast, the ADA protects disabled persons who can perform the essential functions of their jobs with reasonable accommodation. *See* 42 U.S.C.A. § 12111(8) (West 1995).

In *Cleveland*, the plaintiff applied for and received SSDI benefits, and then sought to recover against her employer for wrongful termination under the ADA. In light of the conflicting proposition that the plaintiff was too disabled to work under the Social Security Act, but not too disabled to work under the ADA, the Court of Appeals for the Fifth Circuit applied a judicial presumption estopping the plaintiff from maintaining both theories. While the Supreme Court rejected the rationale that the two claims were so inherently inconsistent as to warrant a presumption, the Court held that in some cases earlier SSDI claims may genuinely conflict with an ADA claim. "[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." *Id.* at 1603. In *Cleveland*, the ADA plaintiff claimed that her statements were accurate "in the time period in which they were made," *id.*, which appeared to have presented a factually-based argument that her condition changed to some degree during the applicable time periods. This amounted to a sufficient explanation under the facts of Cleveland's case, but each case must be decided on its unique facts. *Id.* at 1601.

*See Motley v. New Jersey State Police,* 196 F.3d 160, 163 (3rd Cir.1999). *See also Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 790–91 (7th Cir.1999) ( plaintiff failed to present any factual explanation of inconsistency).

Mr. Talaiferro fails to rebut the inconsistency of his earlier assertion that he is "totally disabled" in the face of his present claim that he was capable of performing his job with reasonable accommodations. Without some factual explanation to render the two positions consistent, Talaiferro cannot establish any material issue of fact with regard to that element of the ADA. Therefore, Talaiferro fails to establish that he was a qualified individual.

■ Nevertheless, even if he were "qualified," Talaiferro has failed to establish that he suffered from a "disability" at the time of his discharge. The ADA describes three types of disability, any one of which can trigger the statute's protections. The ADA states:

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(2) (West 1995). Because the statute defines "disability" for each of subparts (A), (B), and (C) "with respect to the individual," the statute's individualized focus requires courts to make a case-by-case determination of whether a plaintiff has a disability. *See Cline v. Wal–Mart Stores Inc.,* 144 F.3d 294, 302 (4th Cir.1998); *Runnebaum,* 123 F.3d at 169; *Ennis,* 53 F.3d at 59–60. As there is no evidence that Mr. Talaiferro had a record of such an impairment or that he was being regarded as having such an impairment, the only issue is whether he actually had an *impairment* which *sub-*

*stantially limits* one or more major life activities.

Taliaferro claims that his osteoporosis and resulting back condition substantially limited his major life activity of working. Assuming that Taliaferro's condition constituted an "impairment," [6] that impairment did not substantially limit his ability to work. Mr. Talaiferro "worked diligently" as a Branch Manager throughout 1997 until his termination on October 1, 1997. (Pl. Dep., Vol I, p. 136). He traveled to and from work; analyzed, approved and rejected loan applications; reviewed loans generated in the branch for compliance with the law and Associates' policies; engaged in marketing efforts with local businesses to arrange financing for consumer purchases; supervised the branch staff; and oversaw the collection efforts of the branch. (Pl. Dep., Vol I, pp. 50, 141–42). Mr. Talaiferro came to work on a regular basis and performed all of these tasks until his termination. (Pl.Dep., Vol.I, p. 142). Mr. Talaiferro even admits when Mr. Brewer informed him that he had been terminated, he asked for alternative employment at any of the Associates' "sister" companies. (Pl.Dep., Vol.I, pp. 62–65). For thirty days after his termination, he actively sought employment elsewhere. *Id.* at 168–69. These actions in no way establish that he was substantially limited in working at the time of his termination. As Mr. Talaiferro was not a qualified individual with a disability at the time of his termination, he fails to establish a *prima facie* case of discrimination under the ADA.

## B. DISCRIMINATION UNDER ERISA SECTION 510

Mr. Talaiferro also seeks damages under section 510 of ERISA, 29 U.S.C.A. § 1140 (West 1998), on the ground that the Associates terminated him in order to prevent his qualification for disability benefits. Section 510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against any participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan ...

29 U.S.C.A. § 1140 (West 1998). This provision protects against the unlawful interference with an employee's ability to accrue additional benefits and to obtain pension rights. In order to prevail on a section 510 claim, an employee "must prove a specific intent [on the part] of the employer to interfere with [the] employee's pension rights." *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 239 (4th Cir.1991). "[A] plaintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated the plaintiff, and to conclude that the employer harbored the requisite unlawful intent." *Id.*

The Fourth Circuit Court of Appeals has adopted the familiar *McDonnell Douglas* burden-shifting analysis, *see infra.,* for use in the absence of direct evidence of discrimination in an ERISA section 510 claim of discriminatory treatment. *See Conkwright,* 933 F.2d at 239; *Runnebaum,* 123 F.3d at 176. In order to establish a *prima facie* case under ERISA, a plaintiff must show (1) membership in a benefit plan; (2) job performance that meets the employer's legitimate expecta-

---

**6.** A "physical or mental impairment" means:
(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, re-

productive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
29 C.F.R. § 1630.2(h) (1999).

tions; (3) an adverse employment decision; and (4) a causal connection between the employment decision and the membership in the benefit plan. *Fleming v. Borden, Inc.*, 829 F.Supp. 160, 162 (D.S.C.1992).

■ Due to his complete failure to establish a material issue of fact regarding the fourth element of his *prima facie* case, Mr. Talaiferro's claim fails. Assuming that his job performance met his employers' expectations, Mr. Talaiferro has produced no evidence of a causal connection between his termination and any desire on his part to apply for disability benefits. While Mr. Talaiferro has presented some evidence that the Associates supervisors may have been aware that he suffered from some back problems and resulting pain (Pl.Dep.Vol.I, p. 94), nothing in the record establishes that anyone at the Associates had any indication that Mr. Talaiferro was considering applying for disability benefits. Mr. Talaiferro testified himself that he had not planned on filing for disability until the Orangeburg branch had been audited.[7] *Id.* at 86. He mentioned this intent to no one, and only made one telephone call to the Dallas office to inquire generally about disability benefits. This call was made sometime prior to his termination. *Id.* at 81. It was not until *after* Mr. Talaiferro was terminated that he first raised the issue of disability benefits. In response to hearing he was being terminated, Mr. Talaiferro said to Mr. Brewer: "how about letting me go ahead and put in my papers for disability." *Id.* at 62–63. Alternatively, he asked if he could be transferred to another position with an Associates' "sister" company— "anything to stay with the company." *Id.* at 66. In the light most favorable to Mr. Talaiferro and in recognition of the slight burden he carries with respect to the *prima facie* elements, this evidence fails to establish even the possibility that the decision to terminate his employment was causally related to his desire to apply for disability benefits.

Furthermore, Mr. Talaiferro cannot rebut the reason articulated for his termination—employee complaints concerning his management style. It is undisputed that several of the Orangeburg employees complained orally to Mr. Binkley and subsequently authored formal letters of complaints about Mr. Talaiferro's treatment of the Orangeburg employees. In response to these complaints, Associates investigated the issues and determined that Mr. Talaiferro's conduct and treatment of his employees was unacceptable. Mr. Talaiferro recalled that Mr. Brewer explained during the termination meeting that the decision the terminate him was based upon these complaints. (Pl. Dep., Vol. I, p. 62). Moreover, Mr. Talaiferro does not deny the allegations made against him in the complaints, but instead attempts to explain the instances in light of his interpretation of what happened and the reasons behind his behavior. *Id.* at 107. Nevertheless, even if the substance of the complaints could be explained away, there is no evidence any intent by the defendants to interfere with any application or qualification for disability. Thus, plaintiff cannot maintain a discrimination claim under ERISA section 510, and summary judgment for the defendants is appropriate.

## C. BREACH OF CONTRACT

■ In South Carolina, where employment is not for a definite term and there is no contractual or statutory restriction on the right of discharge, the employment is presumed to be terminable at the will of either party. Mr. Talaiferro concedes that he had no express contract of employment, but maintains that his at-will status was altered. At-will status confers on the employer the right to lawfully discharge the employee for "good reason, no reason, or even a bad reason." *Culler v. Blue Ridge Co-op.*, 309 S.C. 243, 422

---

7. Taliaferro requested an audit in August, 1997, (Pl.Dep., Vol.II, p. 70), but no audit occurred until after his termination.(Brewer Dep., p. 70).

S.E.2d 91, 92 (1992). *See also Prescott v. Farmers Telephone Co-op., Inc.,* 335 S.C. 330, 516 S.E.2d 923, 924 (1999) (recognizing the remaining force of at-will employment in South Carolina). The termination of an at-will employee usually does not give rise to liability of the part of the employer. *See Hudson v. Zenith Engraving Co.,* 273 S.C. 766, 259 S.E.2d 812, 813 (1979). However, an exception to this rule applies when either: (1) the at-will status is altered by the terms of an employee handbook (the handbook exception), *Small v. Springs Indus., Inc.,* 292 S.C. 481, 357 S.E.2d 452 (1987); or (2) the termination violates a clear mandate of public policy (the public policy exception), *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 337 S.E.2d 213 (1985) (at-will employee may not be terminated for refusing to violate the law by ignoring a subpoena). In addition, while not an exception to the rule of at-will employment, the at-will status of an employee may be altered by an oral contract of definite employment in accordance with traditional common-law contractual principles. *Prescott,* 516 S.E.2d at 926. Mr. Talaiferro attempts to alter his at-will status, both by use of the handbook exception and an alleged oral contract of definite employment.

■■■ In the present case, Mr. Talaiferro claims that practice and policy documents of Associates created a contract of employment which required the Associates to use progressive discipline, such as a warning, prior to terminating an employee. The South Carolina Court of Appeals in *Jones v. General Elec. Co.,* 331 S.C. 351, 503 S.E.2d 173 (Ct.App.1998), *cert. denied,* (S.C. May 14, 1999), recently set forth three issues relevant to the determination of whether or not an employee handbook can form the basis of a contract between employer and employee. The court must determine whether (1) the handbook set out procedures binding on the employer, (2) those procedures applied to the discharged employee, and (3) the employer violated those procedures. *Id.* at 177.

However, if the employer wishes to issue an employee handbook without being bound by it and with a desire to continue under the at-will rule, the employer is free to do so by inserting a *conspicuous disclaimer* in the employee handbook stating the handbook creates no right of employment and the company can terminate employment at any time. *Johnson v. First Carolina Fin. Corp.,* 305 S.C. 556, 409 S.E.2d 804 (Ct.App.1991) (emphasis added). Thus, the question becomes whether any of the disclaimers present in the Associates' policies were conspicuous enough to overcome any of the promises sought to be enforced.

Mr. Talaiferro argues that the Associates Human Resources Policy 1050 and the "People Produce Profits" booklet discussing the 1050 Policy alter his employment at-will status to require warnings and/or progressive discipline prior to termination. The documents and policies relevant to the status of Mr. Talaiferro's employment contain numerous reference to the at-will status of the Associates employees. First, defendants cite the application for employment, reviewed and signed by Mr. Talaiferro, which states:

> I understand and agree that if I am hired by the Company that my employment relationship with the Company or any affiliates of the Company will be as an "employee-at-will." Both the Company and I retain the rights to terminate the employment relationship at any time with or without cause, and without incurring liability to the other party. I further understand and agree that no agreement providing that the term of my employment is for a specific time nor any agreement restricting or limiting the right of the Company or any affiliate to terminate my employment to matters involving just cause shall be effective, unless such an agreement is reduced to writing and signed by either the Chairman of the Board or the President of the Company and me. My signature below

acknowledges that I understand and agree to the above provisions.

(Pl.Dep.Ex. 20). This paragraph follows the heading **EMPLOYMENT RELATIONSHIP**, and is found on the last page of a five-page employment application just above the line for the applicant's signature signed and dated May, 1986. After Mr. Talaiferro was hired, he also reviewed and signed a "Confidentiality, Conflicts or Interest, and Proprietary Property Agreement," which displayed the following statement in section five of eight:

**INTEGRATION AND BINDING EFFECT**

... NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A GUARANTEE OF EMPLOYMENT OR CONTINUED EMPLOYMENT

(Def.Ex. P). Later that same year, Mr. Talaiferro signed an acknowledgment attesting to receipt and review of an updated document which added the following to the preceding statement:

EMPLOYMENT IS AT–WILL, GIVING THE COMPANY AND ME THE CONTINUING RIGHT TO TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME FOR ANY REASON.

(Pl.Dep.Ex. 4).

The 1050 Policy sets forth procedures for employee performance deficiency notification, and while it makes available a series of progressive disciplinary steps, it also contains the following disclaimer in bold face type boxed in at the top of the policy:

... **The provisions of this policy are considered *guidelines only* and shall not be construed as creating a contract or an employment relationship other than "at-will". Nor shall the provisions of this policy limit the right of the Company or any employee regardless of reason, without incur-**

**ring any liability as a result of the termination.**

(Pl.Dep.Ex. 2).

Likewise, the "People Produce Profits" booklet, discussing "Terminations/Demotions," states:

*Note:* Nothing in this statement creates or should be construed as creating a contract of employment, or a term of condition of employment. The employment relationship between Associates and its employees is at will, giving both Associates and the employees the right to terminate the relationship at any time for any reason.

(Pl.Dep.Ex. 3). Talaiferro admits that the booklet did not require warning before termination and did not change his at-will status. (Pl.Dep., Vol.I, pp. 33–34).

The issue of the effect of the disclaimer depends not on Mr. Talaiferro's interpretation, but on its conspicuousness. In *Jones v. General Elec. Co.,* the South Carolina Court of Appeals used the Uniform Commercial Code's (UCC) definition of "conspicuous" as guidance in analyzing employee handbook disclaimers. 503 S.E.2d at 179.

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" of it is in larger or other contrasting type.

*Id.* (citing S.C.Code Ann. § 36–1–210(10) (Law. Co-op 1976)). In that case,

the language of the 1988 GE handbook stating employment was at will was not distinguished from other information by bold type, underlining, or any other method to emphasize and reasonably call attention to its contents. In the 1993 version of the handbook, the language is in all capital, but it is not otherwise distinguishes by being underlined, set apart with a distinctive border, or in a

contrasting type of color, etc. The information appears only in the body of the Foreword, and is not repeated.

Based upon these facts the court found a material issue of fact as to whether the language was sufficiently conspicuous to be an effective disclaimer.

However, unlike the disclaimer in *Jones*, the language in the Associates 1050 Policy is distinguished from other information, appears in bolded text, and, most noticeably, is set apart in a text box at the top of the first page of the Policy. *Compare Marr v. City of Columbia*, 307 S.C. 545, 416 S.E.2d 615 (1992) (conspicuousness found where disclaimer placed in large letters on the front cover of employee handbook, and reiterated in large bold type on a separate page of the handbook); *Johnson*, 409 S.E.2d at 805 (S.C.Ct.App.1991) (conspicuousness found where there were statements at the end of handbook requiring employees to confirm they understood the handbook did not create an express or implied contract). Furthermore, the disclaimer is repeated in large part, while in a less conspicuous manner, in the "People Produce Profits" booklet referencing the 1050 Policy.

■■■ Even though in most instances summary judgment is inappropriate when a policy contains both a disclaimer and promises, the court should resolve the issue as a matter of law if the handbook statements and the disclaimer, taken together, establish beyond a reasonable doubt tha[t] an enforceable promise either does or does not exist. *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E.2d 589, 596 (1994). The conspicuousness of the 1050 Policy disclaimer in this case is further supported by the repeated disclaimers throughout Associates procedures and policies. Furthermore, the undisputed permissive nature of the 1050–type warnings or progressive discipline supports the reasonable interpretation that the disclaimers remained in effect. Even Mr. Talaiferro admits that the 1050 Policy did not establish "mandatory" requirements. (Pl.Dep.,

Vol.1, pp. 28–29). In recognition of this understanding, he also admits to threatening to fire one of his employees without following such a procedure. Mr. Brewer also testified that he has terminated three other managers without any warning or progressive discipline. (Brewer Dep., pp. 74, 92–93). Therefore, the permissive force of the 1050 procedures and the conspicuousness of the disclaimers present establish as a matter of law that Mr. Talaiferro's at-will employment status could not have been altered.

■■■ As an additional ground for his cause of action for breach of employment contract, Mr. Talaiferro claims that Associates represented orally that he would not be terminated except for "just cause." Mr. Talaiferro relies upon a comment attributed to Mr. Brewer at a Group Managers business meeting in Myrtle Beach, South Carolina that "as long as you're doing your job, your employment is secure. The only thing we don't want, we don't want stupid mistakes or breaking company policy." (Pl. Dep., Vol I, pp. 10–14). Mr. Talaiferro also cites to a similar statement made casually by Mr. Brewer and Ken Stephenson during long car rides. *Id.* at 15.

■■■ In South Carolina, the at-will status of an employee may be altered by an oral contract for definite employment. *Prescott*, 516 S.E.2d at 926. To prove the creation of a contract of definite employment, the employee must establish the following elements of a contract: (1) a specific offer, (2) communication of the offer to the employee, and (3) performance of job duties in reliance on the offer. *Id.* In *Taylor v. Cummins Atlantic, Inc.*, 852 F.Supp. 1279, 1286 (D.S.C.1994), the court explained the requirements of the "offer" in this context:

Under South Carolina law,

[I] An offer is the manifestation of the willingness to enter into a bargain, so made as to justify another person in understanding that his assent to

that bargain is invited and will conclude it.

[II] [A]n offer is judged by its objective manifestations, not by the mental reservations or subjective interpretations or intentions of the offeror.

[III] An offer need not be stated in words. Any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for a requested act or a requested promise by the offeree, amounts to an offer.

[IV] [An offer] to be binding, must be definite [and] must be one which is intended of itself to create legal relations on acceptance.

*Id.* (citations omitted). The Associates argues that the statements allegedly made to Mr. Talaiferro are insufficient to give rise to an offer of definite employment. Commenting on the virtually identical argument, the South Carolina Supreme Court in *Prescott* recently held:

The alleged offer, "[a]s long as you do your job, keep your nose clean, that you'd have a job at Farmers Telephone right on" is not sufficiently explicit to constitute an offer to limit termination to just cause. We conclude a reasonable person in Prescott's position would construe the statement as praise or encouragement, or even "puffery," rather than an offer of definite employment. Vague assurances of job security even if repeated, do not give rise to contractual rights.

516 S.E.2d at 299. *See also Brown v. Safeway Stores, Inc.,* 190 F.Supp. 295, 299–300 (E.D.N.Y.1960) ("A casual remark made at a meeting, [or] a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation inherent in such a contract.").

The business meeting attended by Mr. Talaiferro and other Group Managers in Myrtle Beach was not convened to discuss of negotiate employment terms. (Brewer, Dec., ¶ 3). According to Mr. Talaiferro, the purpose of the meeting was for the managers to "project what they're going to do for the next year." (Pl.Dep.Vol.I., p. 14). Furthermore, Mr. Brewer's comments were those of his personal outlook on job security made to encourage his managers to focus on earnings. (Brewer, Dec., ¶ 3). Construing all ambiguities, and inferences in favor of Mr. Talaiferro, the court finds that he has failed to establish that Associates made him an offer of definite employment such that he could not be terminated without warning or some other form of progressive discipline. Mr. Talaiferro had no contract of employment and no contractual expectation of a warning prior to termination. His breach of contract claim and, the action for breach of the covenant of good faith and fair dealing fails accordingly.[8]

## D. DENIAL OF DISABILITY BENEFITS

The Associates sponsors the Short–Term Disability Plan ("STD") and Long–Term Disability Plan ("LTD") from which Taliaferro claims entitlement to benefits under ERISA, 29 U.S.C.A. § 1132(a)(1)(B) (West 1999).[9] The plan administrator is Associates Corporation of North America, a Texas corporation ("ACONA"). The claims administrator is AETNA U.S. Healthcare ("AETNA").

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948,

---

8. *See Satterfield v. Lockheed,* 617 F.Supp. 1359, 1363–64 (D.S.C.1985) (recognizing the inherent contradiction of at-will employment and an action for breach of the covenant of good faith and fair dealing).

9. The only embodiment of the "plan" appears to be the Benefit Book. While this twenty-one page description of the benefits available to Associates employees could be more aptly identified as the "summary description," both parties rely on its content as evidence of the plan itself as there is no evidence that a separate plan document exists. *See* Ivy Dec. ¶ 2 ("The plan and summary plan description for both the STD Plan and the LTD Plan are contained in the same document.").

103 L.Ed.2d 80 (1989), the United States Supreme Court ruled that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See also Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir.1995) (quoting same). If the plan confers such discretionary powers upon an administrator or fiduciary, the court reviews its decision for abuse of discretion. *Id.; Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997) (acknowledging that the Supreme Court's *Firestone Tire* decision "significantly curtailed a court's ability to review a discretionary decision of the administrators of an employee benefits plan") (citation omitted). "Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997) (citations omitted). The administrator or fiduciary has not abused their discretion if its decision is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan,* 105 F.3d at 161 (quoting *Bernstein,* 70 F.3d at 788).

The Associates contends that the plan grants the requisite degree of discretion for review under the abuse of discretion standard. As evidence of this, Associates points to language in the plan which states that the decisions made are "final." In the STD Plan, it states:

> If your STD claim is denied, the Group Insurance Department will give you a written explanation within 60 days after your written notice of disability is received. Within 60 days after receiving a

denial, you may request the Company to review its decision by writing to the Vice President of Compensation and Benefits at the Associates Corporation of North America (A Texas Corporation) [ACONA]. The Company will make a *final decision* within the next 60 days. Then, if you still feel a claim has been unjustly denied, you may filed suit in state or federal court.

Benefits Book at 13 (emphasis added). Five pages later, in the section describing the LTD Plan, the Benefits Book provides:

> If an LTD claim is denied, the insurance company will give you a written explanation within 60 days after your written notice of disability if received. Within 60 days after receiving a denial, you may request the insurance company to review its decision. The insurance company will make a *final decision* within the next 60 days. Then, if you still feel a claim has been unjustly denied, you may file suit in state of federal court.... The plan is insured by the Prudential Insurance Company of America under Policy Number 21632. Your contributions are used to pay the insurance premiums to provide this insurance coverage. The plan insurer is *solely responsible* for determination of and payment of all benefits payable under the plan.[10]

Benefits Book at 18 (emphasis added). These provisions appear to give the plan administrator, ACONA, and the claims administrator, the "plan insurer" [AETNA], discretion over the determination of eligibility and qualification for receipt of STD and LTD disability benefits, respectively. However, the actual discretion exercised over Mr. Talaiferro's claims, both for STD and LTD benefits, resulted in a "final" decision only by the plan administrator, ACONA. In its denial of the application

---

**10.** It unclear from the record what role, if any, Prudential Insurance Company of America plays in the administration of the Associates benefits plan, nor is there any evidence that reveals that AETNA replaced Prudential as the claims administrator. However, this court will assume that AETNA did so replace Prudential based upon the fact that AETNA administers Mr. Talaiferro's claims, and in recognition of both parties' agreement of that particular fact.

for STD benefits, AETNA referenced LTD benefits; AETNA then denied appeal of that decision. Finally, ACONA reviewed the AETNA decision and "confirmed" the denial of both STD and LTD benefits.

When the entity with discretionary authority also has a financial interest as the actual insurer, a conflict of interest may exist. Viewed in the light most favorable to the non-moving party, the conflict of interest suffered by AETNA as the insurer will be considered to have been present with respect to ACONA's decision as well due to the partial reliance by ACONA on AETNA's denial. Where a plan administrator or fiduciary is vested with discretionary authority and is "operating under a conflict of interest, that conflict must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.'" *Firestone Tire*, 489 U.S. at 115, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). The court applies the conflict of interest factor, on a case by case basis, to lessen the deference normally given under this standard of review only to the extent necessary to counteract any influence unduly resulting from the conflict. *Bedrick v. Travelers Insurance Co.*, 93 F.3d 149, 152 (4th Cir.1996). "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis*, 126 at 233. In addition to the conflict of interest factor, the court must also consider other factors identified by the Fourth Circuit in determining whether the administrator abused his discretion—(1) the scope of the discretion conferred; (2) the purpose of the plan provision which grants the discretion; (3) any external standard relevant to the exercise of that discretion; and (4) the admin-istrator's motives. *See Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir.1996). Taking into account all of the factors, the court finds that ACONA acted reasonably in denying Mr. Talaiferro benefits, as the denial decision resulted from a deliberate, principled reasoning process and was supported by substantial evidence.

"The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Lockhart v. UMWA 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir.1993); *see also* 29 U.S.C.A. § 1104(a)(1)(D) (West 1999) (trustees must discharge duties in accordance with documents and instruments governing the plan). The plan provides that "STD and LTD coverages end on the earliest of the following dates: The date your employment ends ...." Benefits Book at 20. With regard to the definition of what constitutes "disability," the STD plan and the LTD plan differ slightly. The STD plan describes "disability" as: "a physical or mental condition or illness that keeps you from being able to perform the duties of your regular job (or other duties your supervisor assigns) for more than one week." Benefits Book at 8. The LTD plan defines "totally disabled" as: "a physical or mental impairment that keeps you from being able to work." Benefits Book at 15.

Mr. Talaiferro's application for disability benefits was denied first by AETNA, and subsequently by ACONA. AETNA denied the request for benefits after receiving the application for STD benefits, medical reports and records from Drs. Garowich, Gray, Jones, Hood, Howard, Pacult, Redwine, and Warren. The April 23, 1998 denial letter and the subsequent explanation provided by AETNA to Mr. Talaiferro [through his attorney] stated three reasons for the denial: (1) that Mr. Taliaferro was not "disabled" as that term is defined in the plan; (2) that the application for benefits was untimely;[11] and (3) that benefit coverage ended on the

---

11. AETNA subsequently rescinded the timeliness of the application as a ground for denial of benefits. *See* Letter from Crull to McClain [plaintiff's attorney] of 7/23/98.

date that employment ends. By way of a letter explaining his position, Mr. Talaiferro appealed that denial on May 17, 1998. On July 23, 1998, AETNA denied the appeal. Furthermore, the ACONA Welfare Committee also reviewed the denial decision and his letter of appeal. Rather than only affirming AETNA's denial of disability benefits, it appears that the ACONA Welfare Committee reviewed the various documents relating to the claim (*see* Minutes of the ACONA Welfare Committee meeting 8/14/98), and made its own independent findings that Mr. Talaiferro was not disabled, and specifically that his employment ended prior to his application for benefits.

Turning first to the "deliberate, principled reasoning process" prong, the Committee reviewed AETNA's denial of both STD and LTD benefits. The Committee also found that as his employment with the Associates had terminated prior to the date he applied for disability benefits, Mr. Talaiferro was no longer covered under the terms of the benefit plan. As described *infra.*, Mr. Talaiferro's employment ended on October 1, 1997. Viewed in the light most favorable to plaintiff, the record fails to establish that any request or application for disability was made prior to the date of his termination. Mr. Talaiferro contends that he telephoned the Associates' main office in Texas prior to his termination in order to inquire about the procedure for applying for disability benefits; however, he admits that he did not actually request or make any such application at that time. (Pl.Dep.Vol.I, p. 81). Furthermore, only after Mr. Brewer informed him that he had been terminated did Mr. Talaiferro raise the specter of disability as an alternative to losing his job. This type of unilateral bargaining in response to being terminated from a position does not constitute either a formal request or application for disability benefits, and it did not occur prior to the end of his employment. Throughout the application process, Mr. Talaiferro relied upon the date of October 20, 1997 as the date on which he first applied for benefits. (*See* Letter from Talaiferro to ACONA of 10/30/97). Therefore, it was not an abuse of discretion to deem Mr. Talaiferro's application for disability benefits made after his termination from his position with the Associates.

Even when the review is tempered with the presence of a possible conflict of interest, the Committee gained little advantage from denying a terminated employee's application for disability benefits. The fact that AETNA suffered from the conflict of interest lessens the effect of such a conflict on the ACONA decision of August 18, 1998. As an entity separate from AETNA, ACONA as the plan administrator possessed the power, which it exercised, to review Mr. Talaiferro's claim for benefits. The minutes from the Committee meeting indicate that ACONA performed its own review of the application and medical records submitted. (*See* Minutes of 8/14/98). Therefore, the decision to base denial on a lack of eligibility for coverage, among other reasons, was not an abuse of discretion, even in light of the possible conflict of interest present within the underlying review.[12]

Mr. Talaiferro cannot ignore his ineligibility for coverage at the time he applied for disability benefits by relying on the belief that his termination was wrongful. ERISA is not the proper means through which to litigate the propriety of a discharge decision. *See Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1078 (4th Cir.1989). Mr. Talaiferro's motion for summary judgment is based entirely on the determination that the medical evidence presented failed to establish that he

---

12. If the plan were construed so as to require *de novo* review, the result would be the same as there is nothing in the record to contradict the substantial evidence supporting the con-

clusion that Mr. Talaiferro was not eligible for disability benefits because he was terminated prior to his application for those benefits.

was "disabled" prior to the date of his termination. However, even if the interpretation of that evidence were not supported by substantial evidence, the denial of benefits stands firm on the independent basis that Mr. Talaiferro was not eligible for benefits in the first place due to his termination on October 1, 1997. Any such determination by this court that the basis for the conclusion that Mr. Talaiferro did not qualify as "disabled" under the terms of the STD and LTD plans would be unnecessary as the denial of benefits on the eligibility ground alone suffices to uphold the denial.

### E. RIGHT TO PERTINENT DOCUMENTS

Both plaintiff and defendants have moved for summary judgment on this additional ERISA cause of action. Because the court finds that Mr. Talaiferro received copies of all documents pertinent to his claim for benefits, summary judgment in favor of the defendants is appropriate.

Under ERISA, Mr. Talaiferro was entitled to a "full and fair review" of the decision to deny his application for disability benefits. 29 U.S.C.A. § 1133 (West 1999). The regulations governing ERISA claims permit the claimant to (1) request a review upon written application to the plan; (2) review pertinent documents; and (3) submit issues and comments in writing. 29 C.F.R. § 2560.503–1(g)(1) (1999). "The opportunity to review the pertinent documents is critical to a full and fair review, for by that mechanism the claimant has access to the evidence upon which the decision maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability." *Ellis*, 126 F.3d at 237. Pertinent documents are those documents on which the decision maker relied upon in denying the claim. *See also Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 402 (7th Cir.1996) (entire contents of the claim file substantially broader than the entitlement under 29 C.F.R. § 2560.530–1(g)).

Mr. Talaiferro submits that was entitled to documents that related not to his claim for disability, but to his claims of wrongful and/or discriminatory discharge. These documents include: his personnel file; internal and external October 1997 audits of the Orangeburg branch; the internal September 1996 audit of the Orangeburg branch; all of the Associates' personnel manuals since 1986 regarding counseling employees who have poor performance; and any employee assistance programs. (*See* Letter from McClain to Smith of 12/29/97 at attachment A). However, neither AETNA nor ACONA relied upon any of these documents in the denial of his claim. Instead, the decision was based upon Mr. Talaiferro's application in conjunction with the numerous medical records submitted, and the pertinent portions of the Benefits Book.

Mr. Talaiferro contends that these documents were pertinent to the denial because one of his grounds for appeal was that he was still an employee of the Associates at the time of his application as a result of the alleged unlawfulness of his termination. Such a circular argument confuses two separate grounds for legal action—ERISA and wrongful termination. While the plan relied upon the *fact* of Mr. Talaiferro's termination in denying benefits, it did not rely upon the merits underlying the termination decision. Documents related to the Associates decision to terminate Mr. Talaiferro on October 1, 1997 were not pertinent to the denial of disability benefits by ACONA. Therefore, the defendants were not required to provide the information requested.

### F. BREACH OF FIDUCIARY DUTY

From the pleadings submitted on this issue, the only alleged breach of fiduciary duty appears to stem from the allegation that the defendants delayed Mr. Talaiferro from obtaining an application for disability benefits for four months after his initial request in mid-October, 1997. A fiduciary is required to "serve the best

interests of all Plan beneficiaries, not just the best interest of one potential beneficiary." *Ellis,* 126 F.3d at 234. Neither the plan as a whole nor Mr. Talaiferro suffered any injury from this delay. It was not a factor in the final decision by the Committee to deny the application for disability benefits. Therefore, the defendants are entitled to summary judgment on this claim as well.

## IV. CONCLUSION

It is, therefore,

**ORDERED**, for the foregoing reasons that the defendants' motion for summary judgment is **GRANTED** on all counts, and Mr. Talaiferro's motion for partial summary judgment is **DENIED**. Accordingly, the case is dismissed.

**AND IT IS SO ORDERED.**